UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GERALD ROSS PIZZUTO, JR.,<br><br>Petitioner,<br><br>v.<br><br>RANDY BLADES, Warden, Idaho Maximum Security Institution,<br><br>Respondent. | Case No. 1:05-cv-516-BLW<br><br>**MEMORANDUM DECISION AND ORDER**<br><br>**CAPITAL CASE** |

Before the Court is Petitioner's Successive Petition for Writ of Habeas Corpus, in which Petitioner claims that the State is prohibited from executing him under the Eighth Amendment because he is mentally retarded (an "*Atkins* claim"). *See Atkins v. Virginia*, 536 U.S. 304 (2002). The Court previously denied Respondent's Motion for Summary Judgment and held a four-day evidentiary hearing.

After reviewing the record and considering the parties' arguments in their post-hearing briefing, the Court concludes that Petitioner is not entitled to habeas relief, and the Successive Petition will be denied.

## BACKGROUND

In 1986, Gerald Ross Pizzuto, Jr., was sentenced to death for the murders of Berta Herndon and her adult nephew Del Herndon. The Idaho Supreme Court has described the

relevant facts of the crimes against the Herndons as follows:

> Pizzuto approached [the Herndons] with a .22 caliber rifle as they arrived at their mountain cabin and made them enter the cabin. While inside, he tied the Herdons' wrists behind their backs and bound their legs in order to steal their money. Some time later, he bludgeoned Berta Herndon to death with hammer blows to her head and killed Del Herndon by bludgeoning him in the head with a hammer and shooting him between the eyes. Pizzuto murdered the Herndons just for the sake of killing and subsequently joked and bragged about the killings to his associates.

*Pizzuto v. State*, 202 P.3d 642, 645 (Idaho 2008).

The Idaho Supreme Court affirmed Pizzuto's murder convictions, death sentence, and the district court's order denying post-conviction relief. *State v. Pizzuto*, 810 P.2d 680 (1991). Pizzuto's first federal habeas petition was denied by District Judge Alan J. McDonald, and the Ninth Circuit Court of Appeals affirmed. *Pizzuto v. Arave*, 280 F.3d 949 (9th Cir. 2002), *dissent amended in part by* 385 F.3d 1247 (9th Cir. 2004). Pizzuto has also filed at least five additional petitions for post-conviction relief in the state courts, unsuccessfully challenging his convictions and sentences under various theories. *See Pizzuto v. State*, 233 P.3d 86, 88-89 (Idaho 2010) (reciting the case history).

In June of 2002, the United States Supreme Court held that the Eighth Amendment precludes the execution of convicted murderers who are mentally retarded.[1] *Atkins v. Virginia*, 536 U.S. 304 (2002). In so ruling, the Supreme Court left to the states the "appropriate ways to enforce the constitutional restriction." *Id*. at 317.

---

[1] The Court recognizes that the favored term in the clinical community now appears to be "intellectual disability" or "ID," but to maintain consistency it will refer to the term that was used by the Supreme Court in *Atkins*.

**MEMORANDUM DECISION AND ORDER - 2**

The Idaho legislature responded to *Atkins* in March of 2003, enacting Idaho Code § 19-2515A, which contains a substantive definition of  mental retardation and provides a procedural mechanism for adjudicating claims that are raised in cases in which the death penalty is an option. Under Idaho Code § 19-2515A(1), mental retardation is defined as (1) "significantly subaverage general intellectual functioning," meaning an intelligent quotient (IQ) of 70 or below, (2) accompanied by "significant limitations in adaptive functioning" in at least two of ten listed skill areas, and (3) with the onset of these mental deficits and adaptive functioning limitations before the age of 18. Idaho Code § 19-2515A(1)(a),(b).

In June 2003, Pizzuto filed a successive application for post-conviction relief in state district court, claiming that his execution is prohibited because he is mentally retarded. (State's Lodging J-1, pp. 1-10.) He supported his claim largely with evidence that was already in the record, including a 17-year-old opinion from psychologist Dr. Michael Emery.  (*Id*. at p. 151.)  Dr. Emery had evaluated Pizzuto before sentencing and concluded, among other things, that he had a verbal IQ score of 72 on the Weschler Adult Intelligence Scale, Revised (WAIS-R). (*Id*.) Pizzuto did not complete the performance portion of the test or receive a full scale score, and Emery offered an opinion only that Pizzuto's verbal WAIS-R score fell in the "borderline range of intellectual deficiency and probably reflects, at least to some extent, a history that has included little organization, predictability, or formal learning." (*Id*.)

Pizzuto alleged that the partial IQ score, when viewed within a standard margin of

**MEMORANDUM DECISION AND ORDER - 3**

error, placed him within the range of "significantly subaverage general intellectual functioning"; that is, with an IQ of 70 or below. (State's Lodging J-1, p. 5.) To bolster his claim, he pointed to evidence of serious head injuries from his childhood, deficits in educational performance and social interaction, a diagnosis of epilepsy, and the opinions of mental health experts, including a 1996 report from neuropsychologist Dr. Craig Beaver, that Pizzuto had serious "cognitive limitations." (*Id.* at pp. 5-9.) He also attached to his petition a new affidavit from Dr. Beaver (the "2003 Affidavit"), who had reviewed his prior evaluation and remarked that Pizzuto "demonstrated limited intellectual skills indicative of possible mild mental retardation." (*Id.* at p. 59.) In the 2003 Affidavit, Dr. Beaver concluded that Pizzuto "likely meets the standard recently enacted in Idaho Code, Section 19-2515A regarding defendants who are mentally retarded and involved in first degree murder proceedings." (*Id.* at p. 59.)

   The State responded to the successive petition by filing a motion for summary dismissal on procedural grounds. (State's Lodging J-1, p. 114.) The State alternatively contended that Pizzuto had failed to raise a genuine issue of material fact that, if resolved in his favor, would establish that he was mentally retarded. (*Id.* at pp. 6-11.)

   While the State's motion was pending, Pizzuto filed a motion requesting the district court to grant him permission to complete a neuropsychiatric examination, which his counsel asserted was "necessary and material" to proving the *Atkins* claim. (State's Lodging J-1, p. 131-32.) To support the request, Pizzuto offered another affidavit from Dr. Beaver (the "2004 Affidavit"), in which he concluded that in light of Pizzuto's

**MEMORANDUM DECISION AND ORDER - 4**

neurological problems, "[a] current evaluation of Gerald Pizzuto is indicated to determine if he meets the criteria of mental adaptability." (*Id.* at 176.) At a subsequent hearing, Pizzuto's counsel discouraged the judge from ruling on the testing issue until a separate motion to disqualify the judge had been resolved. (*Id.* at p. 52.) At that same hearing, the parties discussed the possibility of agreeing informally to authorize the testing, but the matter was not resolved.  (*Id.* at pp. 52-53.)

After the motion to disqualify the judge and a motion to pursue an interlocutory appeal were denied, Pizzuto moved for summary judgment. (State's Lodging J-2, p. 280.) Although he relied on much of the same evidence that he had lodged previously, he added new affidavits and documentary evidence to the record that he alleged demonstrated significant limitations in adaptive functioning during his developmental years. (State's Lodging J-10, pp. 1-35.)

At the hearing on the parties' dispositive motions, Pizzuto's counsel argued that while she believed there was enough evidence in the record to prove that her client was mentally retarded, if the court disagreed, it should permit additional factual development before disposing of the case. (State's Lodging J-3, pp. 83-84, 105-06.) The state trial court took the matter under advisement and later issued a two-page decision granting the State's motion for summary dismissal and denying Pizzuto's motion for summary judgment.  (State's Lodging J-2, pp. 309-10.) The trial court found that the petition was untimely and that Pizzuto had "failed to raise a genuine issue of material fact supporting his claim of mental retardation." (*Id.* at pp. 309-10.) The court's written ruling did not

**MEMORANDUM DECISION AND ORDER - 5**

mention Pizzuto's requests for additional testing or for an evidentiary hearing. (*Id.*)

On appeal, the Idaho Supreme Court concluded that the district court erred in finding the petition to be untimely, but it nonetheless affirmed the lower court's dismissal of the action on the ground that Pizzuto had not raised a genuine issue of material fact. *Pizzuto v. State*, 202 P.3d 642, 648 (Idaho 2008). In reaching that conclusion, the Idaho Supreme Court construed and applied the substantive definition of mental retardation in Idaho Code § 19-2515A(1) for the first time. *Id.* at 650-51. It found that Pizzuto had not presented a prima facie case that he was mentally retarded under the statutory standards, primarily because he had failed to offer evidence from which a factfinder could conclude that he had significantly subaverage general intellectual functioning – that his IQ was 70 or below – before he turned 18 years old. *Id.* at 650-55. Because it rejected the claim on the intellectual functioning prong, the state court did not address whether Pizzuto had significant limitations in adaptive functioning. *Id.*

While the post-conviction matter was pending, Pizzuto applied to the Ninth Circuit Court of Appeals for permission to raise his *Atkins* claim in a successive habeas proceeding in this Court. The Ninth Circuit granted his request to go forward, and the federal matter was then stayed until after the Idaho Supreme Court issued its final decision. (Dkts. 2, 7.)

After the stay was lifted, Respondent filed an Answer and a Motion for Summary Judgment. This Court denied the summary judgment motion without prejudice, and because Pizzuto had not been allowed to develop the facts completely in state district

**MEMORANDUM DECISION AND ORDER - 6**

court, it authorized him to engage in limited discovery and to complete neuropsychiatric testing. (Dkt. 52, p. 13.) The Court reserved its ruling on whether a full evidentiary hearing would be needed until after the period of investigation and discovery had concluded. (*Id*.)

Pizzuto then submitted an offer of proof, which included new declarations from two mental health professionals who opined that he was mentally retarded under both Idaho law and clinical definitions of the term. (Dkt. 61, Exhibit A; Dkt. 62.) After considering the offer of proof, the Court determined that Pizzuto had raised a "colorable claim" for relief and set the case for an evidentiary hearing. (Dkt. 74.)

The evidentiary hearing was held between November 15 and November 18, 2010. After receiving extensions of time, the parties have completed post-hearing briefing. The matter is now ripe, and the Court is prepared to issue its final ruling.

## LEGAL FRAMEWORK FOR HABEAS REVIEW

### 1.    Deference to the State Court Adjudications – 28 U.S.C. § 2254(d)

When a state court has denied a state prisoner's federal claim on the merits, the 1996 Antiterrorism and Effective Death Penalty Act (AEDPA) requires the federal district court to afford the state court's findings and conclusions substantial deference on habeas review.

Under AEDPA, the Court cannot grant habeas relief on any federal claim that the state court adjudicated on the merits unless the adjudication of the claim:

1.    resulted in a decision that was contrary to, or involved an unreasonable

**MEMORANDUM DECISION AND ORDER - 7**

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court has found that AEDPA's core purpose is to ensure that habeas relief functions as a "'guard against extreme malfunctions in the state criminal justice systems'" and not as a means of mere error correction. *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011) (quoting *Jackson v. Virginia*, 443 U. S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment)).

The first sub-section, § 2254(d)(1), has two clauses, each with independent meaning. For a decision to be "contrary to" clearly established federal law, the petitioner must establish that the state court applied "a rule of law different from the governing law set forth in United States Supreme Court precedent, or that the state court confronted a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrived at a result different from the Court's precedent." *Williams v. Taylor*, 529 U.S. 362, 404-06 (2000).

To satisfy the "unreasonable application" clause, the petitioner must show that the state court was "unreasonable in applying the governing legal principle to the facts of the case." *Williams*, 529 U.S. at 413. A federal court cannot grant relief simply because it concludes in its independent judgment that the state court's adjudication of the claim is

**MEMORANDUM DECISION AND ORDER - 8**

incorrect or wrong; the state court's application of federal law must be objectively unreasonable. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002). The state court need not cite or even be aware of the controlling United States Supreme Court decision to be entitled to AEDPA deference. *Early v. Packer*, 537 U.S. 3, 8 (2002).

To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court's decision was based upon factual determinations that were "unreasonable in light of the evidence presented in the State court proceeding." *Id.*

Only when the state court did not adjudicate a federal claim that was fairly presented to it will the federal court's review of the legal claim be *de novo*. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

Under all circumstances, state court findings of fact are presumed to be correct unless the petitioner can rebut those findings by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### 2.    New Evidentiary Development – 28 U.S.C. § 2254(e)

The AEDPA also contains restrictions on new evidentiary development in federal court. Evidentiary hearings are prohibited if the petitioner "failed to develop the factual basis" of a claim in state court, unless the petitioner can meet one of two narrow exceptions. 28 U.S.C. § 2254(e)(2). This restriction also applies when a petitioner seeks relief on new evidence in an expanded record without an evidentiary hearing. *See Holland v. Jackson*, 542 U.S. 649, 652 (2004); *accord Cooper-Smith v. Palmateer*, 397 F.3d 1236,

MEMORANDUM DECISION AND ORDER - 9

1241 (9th Cir. 2005).

A petitioner will be freed from the constraints on evidentiary development in § 2254(e)(2) only if the federal court finds that the petitioner exercised reasonable diligence and was not at fault for the lack of factual development in state court. *Williams v. Taylor*, 529 U.S. 420, 437 (2000).

### 3.    Harmonizing § 2254(d) and § 2254(e)(2) – *Cullen v. Pinholster*

Previously, this Court followed the prevailing view that requests for evidentiary hearings were assessed primarily under § 2254(e)(2). Under that view, if a petitioner could establish that he had pursued his claims diligently in state court but was unable to develop the facts, then an evidentiary hearing could be held in federal court if the petitioner stated a "colorable claim" for relief. In making the colorable claim determination, the court was permitted to take into account all of the evidence, including that which was proffered for the first time in federal court.

The Supreme Court has clarified this issue in *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011). There, the federal district court held an evidentiary hearing on an ineffective assistance of counsel claim and, after taking into consideration evidence that was not before the state court, concluded that the state court's decision involved an unreasonable application of clearly established federal law. *Id*. at 1397. The Ninth Circuit affirmed. *Id*.

The Supreme Court reversed and held "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S.Ct. at 1398. The Court rejected, as an unwarranted "assumption," that if a petitioner

**MEMORANDUM DECISION AND ORDER - 10**

could overcome the restrictions on evidentiary hearings in § 2254(e)(2) and then present new evidence in federal court, the deferential standards in § 2254(d)(1) do not apply. *Id*. at 1400. The Court held instead that "that evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id*.[2]

The Supreme Court noted that § 2254(e)(2) was not rendered superfluous by its holding because that provision "continues to have force where § 2254(d)(1) does not bar federal habeas relief." 131 S.Ct. at 1401. As an example, the Court remarked that not all federal claims fall within the scope of § 2254(d), such as claims that were not adjudicated on the merits by the state court. Under those circumstances, the petitioner would need to satisfy the standards in § 2254(e)(2), or establish that the provision is inapplicable, before the federal court could grant an evidentiary hearing.

### 4.    Applying *Pinholster* to the Present Case

The Supreme Court decided *Pinholster* after the evidentiary hearing was completed in this case, and Respondent now relies on *Pinholster* to argue that this Court must review Pizzuto's claim under § 2254(d) based solely on the record that was before the Idaho Supreme Court. Respondent asserts that because Pizzuto can not satisfy the § 2254(d) standards, the analysis should end there.

Pizzuto disagrees and asks the Court to consider all of the evidence. He contends

---

[2] Although *Pinholster* technically addressed the proper scope of review only under § 2254(d)(1), the Court noted that § 2254(d)(2) *expressly* requires a review of the state court's factfinding based on the evidence presented in the state court proceeding. 131 S.Ct. at n.7. It is now clear that both subsections limit review to the evidence that was before the state courts.

MEMORANDUM DECISION AND ORDER - 11

that *Pinholster* did not address whether a diligent petitioner, such as himself, who was unable to develop the factual record in state court is constrained from developing the facts in federal court. To hold that *Pinholster* prohibits factual development in those circumstances, according to Pizzuto, means that *no* forum has been made available for a diligent petitioner to develop his constitutional claim. He also contends that because he was denied an evidentiary hearing in state court, there has been no true adjudication on the merits of his claim or reasonable factfinding to which this Court must give deference. Alternatively, Pizzuto asserts that the Idaho Supreme Court's decision was based on an unreasonable application of clearly established federal law and that the state court made unreasonable findings of fact in light of the evidence presented.

The Court finds a helpful roadmap for navigating this particular thicket in the Ninth Circuit's recent decision in *Stokely v. Ryan*, 2011 WL 4436268 (9th Cir. Sept. 26, 2011). In *Stokely*, a capital case, the Ninth Circuit acknowledged that *Pinholster* left certain questions unresolved, including "'where to draw the line between new claims and claims adjudicated on the merits' by the state courts." *Id*. at *5. After recognizing that *Pinholster* "dramatically changed the aperture for consideration of new evidence," the Ninth Circuit addressed the petitioner's claim both on the state court record under § 2254(d) and, alternatively, based on the new evidence offered for the first time in federal court. *Id*. at *6-11.

Because many of the same concerns also exist in this case, the Court will follow that same prudent course and analyze Pizzuto's claim both under § 2254(d) based on the

**MEMORANDUM DECISION AND ORDER - 12**

record before the Idaho Supreme Court and with a *de novo* standard applied to all of the evidence. The Court sees no encroachment on the State's interests in comity and federalism because it finds the claim to lack merit under either standard, and the State's judgment will not be disturbed.

## PIZZUTO IS NOT ELIGIBLE FOR RELIEF UNDER § 2254(d) BASED ON THE RECORD BEFORE THE IDAHO SUPREME COURT

### 1.     Clearly Established Federal Law

In *Penry v. Lynaugh*, 492 U.S. 302, 334 (1989), the Supreme Court held that the Eighth Amendment did not bar the execution of mentally retarded offenders. Thirteen years later, the Court changed course and overruled *Penry* in *Atkins.* 536 U.S. at 324-26. The Court concluded that a national consensus had emerged that executing mentally retarded offenders was excessive and disproportionate because society had come to view such offenders as less culpable than offenders of normal intelligence. *Id.* at 316. Mentally retarded offenders are now categorically exempt from execution under the Eighth Amendment. *Id.* at 321.

Despite stating that categorical rule, the Court recognized that "to the extent that there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." *Atkins*, 536 U.S. at 317. The Court cited clinical definitions of mental retardation that required evidence of significant subaverage general intellectual functioning and significant limitations in adaptive functioning in two or more life skill areas, with an onset of these limitations before the age of 18. *Id.* at n.3.

MEMORANDUM DECISION AND ORDER - 13

After acknowledging that the "statutory definitions are not identical, but generally conform to the clinical definitions," *see id.* at n. 22, the Court chose to follow the same path that when it excluded from execution those offenders who are insane by leaving "'to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Id.* at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986)).

### 2.    Idaho's Legislative Response and the Idaho Supreme Court's Decision

In response to *Atkins*, the Idaho Legislature enacted Idaho Code § 19-2515A, which defines mental retardation as follows:

(1) As used in this section:

(a) "Mentally retarded" means significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two (2) of the following skill areas: communication, self-care, home living, social or interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety. The onset of significant subaverage general intelligence functioning and significant limitations in adaptive functioning must occur before age eighteen (18) years.

(b) "Significantly subaverage general intellectual functioning" means an intelligence quotient of seventy (70) or below.

In Pizzuto's case, the Idaho Supreme Court interpreted Idaho Code § 19-2515A for the first time and applied its substantive definition to the evidentiary proffer that Pizzuto had presented in support of his post-conviction petition. *Pizzuto*, 202 P.3d at 650.

The Idaho Supreme Court concluded that Pizzuto had failed to offer sufficient evidence to create a disputed issue of material fact as to whether he had significantly

**MEMORANDUM DECISION AND ORDER - 14**

subaverage intellectual functioning before the age of 18. *Id.* at 655. The court rejected

Pizzuto's argument that the Emery IQ score of 72 should be interpreted as being lower

than 70 because of a standard error of measurement, concluding that "the legislature did

not require that the IQ score be within five points of 70 or below. It required that it be 70

or below." *Id.* at 651. The state court also found that other expert opinions in the record

about Pizzuto's mental functioning reasonably supported an inference that his IQ was

higher than 70 before he was 18 years of age and could have decreased before Emery

tested him at age 29. *Id.* at 651-55. Finally, the court emphasized that, to be entitled to the

protection of the *Atkins* rule, an offender was required to demonstrate that he was mentally

retarded "at the time of the murders and prior to his eighteenth birthday," which Pizzuto

had not done. *Id.* at 655.

Finding the evidence insufficient on the general intellectual functioning element,

the Idaho Supreme Court did not discuss the adaptive functioning component of Idaho

Code § 19-2515A(1).

### 3. The State Court's Decision Was Not Contrary to or an Unreasonable Application of Clearly Established Federal Law

Pizzuto argues that *Atkins* "set a constitutional floor" and "embraced the clinical

definitions of mental retardation by the American Association of Mental Retardation

('AAMR') and the American Psychiatric Association ('APA') [in the Diagnostic and

Statistical Manual of Mental Disorders (4th Ed. text rev. 2000) (DSM-IV-TR)]." (Dkt.

203, p. 7.) According to him, "under *Atkins*, the Eighth Amendment protects from

**MEMORANDUM DECISION AND ORDER - 15**

execution those individuals who meet the AAMR criteria, or the virtually identical criteria of the DSM-IV-TR." (*Id.* at 11.) He argues that the Idaho Supreme Court's interpretation of Idaho Code § 19-2515A(1) went below the floor set by the clinical definitions discussed in *Atkins* and is therefore contrary to or an unreasonable application of clearly established federal law.

Respondent counters that Pizzuto's argument is really a camouflaged attempt to raise new constitutional claims that were not properly exhausted in the Idaho Supreme Court and are now procedurally defaulted. (Dkt. 215, p. 38.) This Court disagrees. Pizzuto's claim for relief is that the Eighth Amendment bars his execution because he is mentally retarded. The Court construes Pizzuto's arguments here as containing the reasons why the Idaho Supreme Court's adjudication of the Eighth Amendment claim was contrary to or an unreasonable application of clearly established federal law, rather than offering new claims.

Chief among Pizzuto's complaints is that the Idaho Supreme Court's ruling seems to set a rigid cut-off for IQ test scores of 70 or below without allowing for statistical adjustments. These adjustments include the "Flynn effect" and a standard error of measurement for intelligence testing.

The Flynn effect is a theory that the IQ scores of a population will rise slightly over time until a particular test is re-normed. *See, e.g.*, *In re Salazar*, 443 F.3d 430, 433 (5th Cir. 2006) (discussing the theory); *United States v. Hardy*, 762 F.Supp.2d 849, 857-63 (E.D.La. 2010) (same). The mean or average score on a standardized IQ test is 100, but the

**MEMORANDUM DECISION AND ORDER - 16**

Flynn effect posits that scores rise slightly over time, approximately .33 points per year or 3 points per decade, until the test is recalibrated with a current population sample to create a new average of 100. *Hardy*, 762 F.Supp.2d at 858. According to this theory, an IQ score at a given point in time might be inflated, depending on when the test was last renormed, and should be adjusted downward to provide a more accurate assessment of the test-taker's IQ. *Id*. at 857-58.

Pizzuto is correct that many courts take the Flynn effect into consideration when assessing IQ scores as part of a claim of mental retardation. *See*, *e.g.*, *Thomas v. Allen*, 607 F.3d 749, 758 (11th Cir. 2010) (collecting cases). But this view is certainly not a universal one, and other courts have rejected the theory. *See Maldonado v. Thaler*, 625 F.3d 229, 238 (5th Cir. 2010) ("neither this court nor the [state court] has the Flynn effect as scientifically valid"); *Green v. Johnson*, 515 F.3d 290, 300 n.2 (4th Cir. 2008) ("neither *Atkins* nor Virginia law appears to require expressly that [the Flynn effect] be accounted for in determining mental retardation status"). Still other courts acknowledge that a factfinder should consider the Flynn effect but need not accept it as conclusively true. *See Walker v. True*, 399 F.3d 315, 323 (4th Cir. 2008) (remanding to the district court to consider "the persuasiveness of the Flynn Effect evidence"). *Atkins* did not discuss the doctrine expressly, and there is otherwise no clearly established federal law regarding its applicability to IQ testing, generally, or to *Atkins* claims, specifically. At best, the matter is unsettled.

This Court is more troubled by the Idaho Supreme Court's apparent rejection of a

**MEMORANDUM DECISION AND ORDER - 17**

standard error of measurement on individual testing instruments. In turning aside Pizzuto's argument that the Emery score of 72 could be lower because of a five-point margin of error on that test, the state court remarked that, "the legislature did not require that the IQ score be within five points of 70 or below. It required that it be 70 or below." *Pizzuto*, 202 P.3d at 651. Here the state court appears to have applied a strict interpretation of the language that the Idaho legislature chose to use, holding that any full scale score above 70 fails as a matter of law, without regard to a range of error.[3]

Common sense about the nature of human error suggests that no single number on a test can measure intellectual functioning with absolute pinpoint accuracy. This is why professionals in the field agree that scores on IQ tests fall within a small range on either side of the reported numerical score, usually plus or minus three to five points. *See* DSM-IV-TR, p. 41 ("[i]t should be noted that there is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument"); *see also*, *e.g.*, *State v. Anderson*, 996 So.2d 973, 989 (La. 2008) (noting possible margin or error); *Stripling v. State*, 401 S.E.2d 500, 504 (Ga. 1991) (same). Pizzuto argues that the Idaho Supreme Court's interpretation creates a risk that an individual with a full scale IQ score between 70 and 75 and significant limitations in adaptive functioning, both manifested

---

[3] This Court uses the term "appears" because, while the Idaho Supreme Court noted that the literal language of the statute prohibited the consideration of a score above 70, it next hypothesized that even if a standard error of measurement were applied, "[i]t would be just as reasonable to infer that Pizzuto's IQ on December 12, 1985, was 77 as it would be to infer that it was 67." *Id.* at 651. It is not entirely clear whether the state court's opinion in Pizzuto's case precludes consideration of a standard error of measurement in all cases. But because both Pizzuto and Respondent seem to assume that to be true, the Court will likewise so assume for purposes of this decision.

**MEMORANDUM DECISION AND ORDER - 18**

before age 18, could be classified as mentally retarded under most clinical and statutory definitions and yet still be eligible for execution under Idaho law. The Idaho Supreme Court could have avoided this problem while remaining faithful to plain language of the statute by interpreting the phrase "IQ score of 70 or below" as allowing for a standard error of measurement. This is so because a person who receives a full scale IQ score of 72 on a test may have an *actual* IQ score on that test as low as 67 or as high as 77, and where on this continuum the most likely score lies  – above or below 70 – is a question of fact to be decided on all of the evidence presented.

On the other hand, a line must be drawn somewhere, and this case illustrates that the marriage between clinical standards and legal rules is not always an easy one. A clinician may be overinclusive in borderline cases to offer support and treatment to those in need. But the law must provide workable rules that necessarily include and exclude. A prominent recent example is the Supreme Court's decision in *Roper v. Simmons*, 543 U.S. 551 (2005). There, the Court held that defendants who are under the age of 18 when they commit murder are categorically excluded from the death penalty, even though there may be little difference between the reasoning and judgment ability of a 17-year-old nearing his 18th birthday and a person who has just recently turned 18. *Id*. at 568.

Despite these concerns, the Court agrees with Respondent that the Idaho Supreme Court's failure to apply statistical adjustments for IQ scores does not amount to an objectively unreasonable application of clearly established federal law. The *Atkins* Court recognized that the most difficult question will be determining who is in fact mentally

**MEMORANDUM DECISION AND ORDER - 19**

retarded, and it gave states leeway to develop rules and procedures within a broad

framework. 536 U.S. at 317. While the Supreme Court observed that existing statutes

"generally conform" to clinical definitions, it did not constitutionalize any specific

definition. *See Clark v. Quarterman,* 457 F.3d 441, 445 (5th Cir. 2006) ("it is not 'clearly

established Federal law as determined by the Supreme Court of the United States' that

state court analysis of subaverage intellectual functioning must precisely track the

AAMR's recommended approach"). The Court has since reaffirmed that *Atkins* "did not

provide definitive procedural or substantive guides for determining when a person who

claims mental retardation 'will be so impaired as to fall [within *Atkins*' compass.]' " *Bobby

v. Bies*, 129 S.Ct. 2145, 2150 (2009).

　　　To be sure, a definition of mental retardation that falls well outside of the

framework announced in *Atkins* would raise serious constitutional questions, but the Idaho

Supreme Court's interpretation does not venture into that territory. Other states have also

established bright line cut-off scores for IQ tests near two standard deviations below the

mean (or 30 points below 100). *See*, *e.g.*, *Cherry v. State*, 959 S.2d 702, 713-14 (Fla.

2007) (applying a strict IQ cutoff of 70); *Bowling v. Commonwealth*, 163 S.W.3d 361,

374-75 (Ky. 2005) (stating that "*Atkins* did not discuss margins of error"); *Howell v. State*,

151 S.W.3d 450, 458 (Tenn. 2004) (interpreting statute demanding "significantly

subaverage general intellectual functioning as evidenced by a functional intelligence

quotient (I.Q.) of seventy or below" to impose a "bright line" cutoff at 70). Pizzuto has

cited no case, and the Court is aware of none, holding that a state's failure to apply either

**MEMORANDUM DECISION AND ORDER - 20**

the Flynn effect or a standard error of measurement is contrary to or involves an
unreasonable application of *Atkins*.

Most importantly, whatever risk might exist that the Idaho Supreme Court's
interpretation of Idaho Code § 19-2515A(1) could allow for the execution of a person who
would be classified as mentally retarded under most other definitions, Pizzuto does not fall
within that class, as the Court explains in the *de novo* section of this Memorandum
Decision.

For these reasons, the Court concludes that the Idaho Supreme Court's decision was
not contrary to or an unreasonable application of clearly established federal law as
determined by the Supreme Court. 28 U.S.C. § 2254(d)(1).

> **4.      The State Court's Decision Was Not Based on an Unreasonable
>            Determination of the Facts in Light of the Evidence Presented**

Earlier in this proceeding, Pizzuto argued that the Idaho Supreme Court's analysis
of the evidence that he had offered in state court revealed a fundamental misunderstanding
of mental retardation and resulted in skewed factfinding. (*See*, *e.g.*, Dkt. 30, pp. 14-16, 25-
27.) Specifically, he pointed to the Idaho Supreme Court's emphasis in its opinion on
requiring offenders to prove that they were mentally retarded both when the crime was
committed and before the age of 18. (*Id*.) Given that Pizzuto was in his late 20s when the
crimes were committed, the Idaho Supreme Court's discussion implies that mental
retardation as a condition that can develop in adulthood. An illustrative example is the
court's observation that if an offender's mental condition "deteriorated to the point of

**MEMORANDUM DECISION AND ORDER - 21**

becoming mentally retarded" in adulthood, he or she would not be exempt from execution. *Pizzuto*, 202 P.3d at 653-54 (noting that "[t]he issue in *Atkins v. Virginia* is not whether the offender is currently mentally retarded.").

Perhaps nowhere is this more apparent than in the state court's discussion of Dr. Beaver's 2003 Affidavit. In that affidavit, Dr. Beaver stated that Pizzuto had mental limitations that were "indicative of possible mild mental retardation" and that he "likely meets the standard recently enacted in Idaho Code, Section 19-2515A regarding defendants who are mentally retarded and involved in first degree murder proceedings." (State's Lodging J-1, p. 59.) The Idaho Supreme Court concluded that "an opinion that Pizzuto had *possible* mild mental retardation in 1996 is not an opinion that he had an IQ of 70 or below twenty-two years earlier." 202 P.3d at 652 (emphasis in original). The court underscored that Dr. Beaver "was talking about Pizzuto's present condition, not his condition at age eighteen." *Id.* at 653.

While this Court understands the Idaho Supreme Court's concern with not extending the rule in *Atkins* to protect offenders whose intellectual or cognitive decline in adulthood was caused by conditions other than mental retardation, it agrees with Pizzuto that the state court's focus on distinguishing between childhood and adult-onset mental retardation makes little sense. Mental retardation is, *by definition*, a condition that is manifested before the age of 18; it is a developmental intellectual disability that first appears in childhood. *See* DSM-IV-TR, pp. 41-49. Adults who have significant intellectual deficits and adaptive functioning limitations, but with an onset of these deficits *after* the

**MEMORANDUM DECISION AND ORDER - 22**

age of 18, may suffer from dementia, a brain injury, drug induced cognitive decline, or some other neurological disability – but they would not be diagnosed as mentally retarded. Idaho Code § 19-2515A(1) properly reflects this clinical understanding and requires proof of significant intellectual and adaptive deficits beginning before 18 years of age. Therefore, Dr. Beaver's opinion that Pizzuto "likely meets the standard recently enacted in Idaho Code, Section 19-2515A regarding defendants who are mentally retarded" should be construed to mean that he believed that Pizzuto "likely" had all of the conditions supporting a diagnosis of mental retardation before he turned 18.

Whatever else might be said about this apparent error, however, it simply did not lead to unreasonable findings of material fact in light of the evidence presented in state court. Dr. Beaver's 2003 Affidavit was conclusory and qualified, and he retreated from that tentative opinion when he suggested in a later affidavit that Pizzuto needed to be tested again before a definitive conclusion could be reached. More critically, Pizzuto's counsel effectively abandoned the 2003 Affidavit, admitting when questioned during oral argument that no expert had offered an opinion that Pizzuto meets the standards in Idaho Code § 19-2515A.  202 P.3d at 652 n.6.[4]

After excluding the 2003 Affidavit, the Idaho Supreme Court's material factual

---

[4] Without the proper context, this concession would have been somewhat perplexing. Of course, we now know that the reason why Pizzuto's attorneys did not press the 2003 Affidavit as supporting the claim is because Dr. Beaver has since testified here that when he executed that affidavit he did not recall that he had given Pizzuto an IQ test in 1996, and Pizzuto scored well above the cut-off for mental retardation. Dr. Beaver has also since indicated that he would not have made the statement that he did in the 2003 Affidavit had he first reviewed the 1996 test scores. (Tr. Evid. Hearing ("Tr."), p. 618.)

**MEMORANDUM DECISION AND ORDER - 23**

finding was that Pizzuto's evidence did not establish a prima facie case that he had significantly subaverage general intellectual functioning, meaning an IQ of 70 or below, before the age of 18. This finding was not unreasonable.

Pizzuto's evidence was exceptionally thin on that aspect of the definition. His proffer was largely made up of bits and pieces of information that was already in the record, repackaged as an *Atkins* claim. He relied heavily on the 1985 verbal IQ test score of 72, but he ignored the fact that while Dr. Emery found that Pizzuto had "borderline" intelligence, Dr. Emery was not testing for mental retardation and did not record either a performance score or a full scale score. Dr. Emery also testified at the sentencing hearing that he believed that Pizzuto's "native intelligence" was probably higher than the verbal score indicated because he had grown up in an impoverished and abusive household that did not encourage verbal engagement:

> I think I need to qualify that though, a little bit, if I may; he showed more intelligence in his conversation, his choice of words, and very frequently individuals who come out of background similar to that of Mr. Pizzuto's, with the interrupted education, a family in which there is very little intellectual interchange, the testing would be spuriously low especially on the verbal scale. In fact, it reflects items such as what factual items were learned in school and that's the place where he did the least effective. So, I guess his native intelligence is probably a little higher than that and the limitations we see are a reflection of the circumstances he grew up in.

(State's Lodging A-18, p. 180.) Notably, neither Dr. Emery nor any other expert offered a opinion as to what Pizzuto's full IQ score or general intellectual functioning might have been years earlier, when Pizzuto was under the age of 18.

Further diminishing the probative value of the single IQ score was other evidence

**MEMORANDUM DECISION AND ORDER - 24**

that supported a finding that Pizzuto's cognitive functioning could have declined significantly in adulthood due to his drug use and other neurological problems. This included an opinion from Dr. Beaver in his 2004 Affidavit, in which he noted that the mental abilities of patients with persistent seizure disorders and organic brain dysfunction will often decline over time, and Dr. James Merikangas's opinion that Pizzuto's long history of drug use caused him "further neurological dysfunction and has caused him to have substantial defects of mind and reason." 202 P.3d at 652.

In short, Pizzuto needed to proffer sufficient evidence in state court from which a factfinder could find that his IQ was 70 or below and that this intellectual deficit was present before he turned 18. The Idaho Supreme Court reasonably concluded that he had failed to carry that burden. The value of the single IQ score in the record was undermined by several factors. And though Pizzuto's attorneys argued that a factfinder could infer lower intellectual functioning from the evidence of Pizzuto's adaptive deficits in childhood and his other alleged neurological disabilities, the state courts were not required to accept these speculative assertions. Because a finding of mental retardation requires both significant intellectual and adaptive functioning deficits, the Idaho Supreme Court was not required to assess the adaptive functioning prong of Idaho Code § 19-2515A(1).[5]

---

[5] Pizzuto also complains that the Idaho Supreme Court's opinion requires evidence of an IQ test score of 70 or below from before an offender's 18th birthday. This Court disagrees and interprets the state court's decision as instead requiring some evidence from which a factfinder could reasonably find that the offender's IQ score would have been 70 or below before age 18, regardless whether he or she was tested as a child. This is a subtle but important distinction, as it would still allow those offenders, like Pizzuto, who were not tested before the age of 18 to prove their claims. An expert could test an adult offender and offer a retrospective opinion as to what his or her measurable general intellectual functioning likely would have been as a child. It is precisely that type of evidence that was missing in state court, but the Idaho

Pizzuto has not demonstrated that he is eligible for relief under either § 2254(d)(1) or (2) based on the record that was before the state court.

## PIZZUTO IS NOT ENTITLED TO RELIEF
### UNDER A *DE NOVO* STANDARD OF REVIEW

Even if Pizzuto could show that he were eligible for relief under 28 U.S.C. § 2254(d), or that AEDPA's deferential standards do not apply, the Court alternatively concludes that he has not established by a preponderance of the evidence in this proceeding that he is mentally retarded such that his execution would be prohibited by the Eighth Amendment.

### 1.      Standard of Law

A claim of mental retardation is governed by the state's substantive definition, and Pizzuto has not persuaded the Court that *Atkins* constitutionalized a specific clinical test or that the Court must disregard Idaho Code § 19-2515A(1). He must prove by a preponderance of the evidence that he (1) has significant subaverage general intellectual functioning, meaning an IQ of 70 or below, (2) accompanied by significant adaptive functioning deficits in two of ten listed skill areas, and (3) that these mental and adaptive functioning limitations existed before he turned 18. Idaho Code § 19-2515A(1).

### 2.      Pizzuto Has Not Established that His General Intellectual Functioning Was Significantly Subaverage Before Age 18

Because the Court held a four-day evidentiary hearing in this matter, it has

---

Supreme Court's more expansive interpretation of the type of evidence that can be used to prove the statutory element allowed proper consideration of the evidence Pizzuto did have.

**MEMORANDUM DECISION AND ORDER - 26**

considerably more evidence before it than was before the Idaho state courts with respect to Pizzuto's general intellectual functioning, as measured by intelligence testing. Three IQ scores are in the record: Dr. Emery's 1985 verbal score of 72 on the WAIS-R; a full scale score of 92 on the WAIS-R, taken as part of Dr. Beaver's 1996 neuropsychiatric testing (91 verbal, 94 performance); and, most recently, a full scale score of 60 on the WAIS-IV from Dr. Ricardo Weinstein during a 2009 evaluation. The challenge in this case is in reconciling the divergent scores into a coherent and accurate picture of Pizzuto's general intellectual functioning during the relevant time frame.

Of these scores, the Court finds the 2009 full scale score of 60 to carry the least weight. Dr. Weinstein tested Pizzuto 35 years after his 18th birthday and conceded that "one can assume, everything being the same, that the accuracy [of an IQ score] would be better the closer [to age 18]." (Tr., pp. 488, 535.)  He acknowledged that "cognitive abilities certainly diminish with age" and that Pizzuto's advanced cardiovascular disease could have contributed to an overall decline in his mental acuity. (*Id.* at 488-89, 536.)

The Court also finds the testimony of Respondent's expert, Roger Moore, Ph.D., regarding Pizzuto's incentive to underperform during the most recent testing to be credible and persuasive. Dr. Moore gave Pizzuto a test to detect malingering – the Test of Memory Malingering (the TOMM) – and concluded that Pizzuto "was giving less than optimal performance" on that particular test. (Tr., p. 769.) According to Dr. Moore, the possibility of malingering is consistent with Pizzuto's other manipulative behavior in his past and "raised a specter that he was an individual who had the willingness or capacity to

**MEMORANDUM DECISION AND ORDER - 27**

volitionally underperform." (*Id*. at 770.) There can be little doubt that *Atkins* has raised the stakes for an offender to be classified as mentally retarded, offering an incentive to provide less than full effort on intelligence testing. There is also extensive evidence in this voluminous record that Pizzuto has a history of manipulative and deceitful behavior when it serves his purposes. Regardless whether some in the professional community may quibble about which test is the most appropriate one to expose malingering, *see*, *e.g.*, Tr., pp. 693-98, Dr. Moore's observations about Pizzuto's motivation not to perform well on the most recent intelligence testing ring true. On the other hand, the results of Dr. Weinstein's tests to measure Pizzuto's effort during his evaluation are ambiguous, at best, and the Court does not place significant weight on them.

As he did in state court, Pizzuto again relies heavily on the Emery verbal score of 72. Initially, Pizzuto is correct that this score does not suffer from the same weaknesses as the Weinstein results. It was much closer in time to Pizzuto's 18th birthday and there is no evidence that he suffered from cardiovascular disease at that time. The Court does not necessarily agree with Pizzuto that he had little incentive to perform poorly in 1985, but the Court will accept that his motivation to underperform may have been less acute because a diagnosis of mental retardation would not have automatically excluded him from a death sentence.

But the other serious flaws that the Court has already noted still exist. Dr. Emery did not record a full scale score and has since disposed of his raw data. Pizzuto's drug use and other neurological problems may have affected his cognitive functioning at the time.

**MEMORANDUM DECISION AND ORDER - 28**

Additionally, Dr. Emery testified at the sentencing hearing that Pizzuto probably had more "native intelligence" than the verbal score indicated. To the extent that Dr. Emery may have softened that opinion a bit during the recent evidentiary hearing – speaking of possibilities rather than probabilities – the Court credits his testimony at the time of the sentencing hearing as the best approximation of his opinion near the time of the evaluation. The Court does not entirely discount Dr. Emery's score as providing some data on the issue, but it finds the score to be a low estimation of Pizzuto's full intellectual functioning before he turned 18.

Dr. Emery's belief about Pizzuto's higher native intelligence is borne out by Dr. Beaver's testing from 1996, when Pizzuto achieved a full scale score of 92 on the WAIS-R. This is well above the cut-off for mental retardation in Idaho Code § 19-2515A(1) and all other statutory and clinical definitions of the condition.

Dr. Beaver's psychometrician at the time, Robyn Hurt (now Edwards) administered the battery of tests to Pizzuto, which included the WAIS-R, as part of the comprehensive 1996 neuropsychological evaluation, but Dr. Beaver reviewed the final scoring. (Tr., p. 572.) Edwards was a clinician with a master's degree who had been trained in the administration of psychological testing instruments, and she had conducted "hundreds" of IQ tests. (*Id*. at 572, 672.) Dr. Beaver testified at the evidentiary hearing that while Pizzuto did poorly on a few other tests in the battery, particularly those that assessed memory and recall, he had no reason to question the validity of the scores on the WAIS-R. (*Id*. at 596, 614, 628.) Edwards agreed. (*Id*. at 672.)

**MEMORANDUM DECISION AND ORDER - 29**

Pizzuto goes to great lengths to impeach and lower the 1996 score. He first argues that when the Flynn effect and a standard error of measurement are applied, the numerical range drops to between 82 and 92. (Dkt. 203, pp. 44-45.) The Court will grant him these adjustments, for the sake of argument, but they still do not get him close to the threshold for significantly subaverage general intellectual functioning.

In an effort to drive the score even lower, Pizzuto speculates that he may have been motivated to perform better than he otherwise would have because Dr. Beaver's "very attractive" female psychometrician administered the test. (Dkt. 203, p. 47.) He points to expert testimony at the evidentiary hearing about how external incentives, such as monetary rewards, can lead to an improvement in IQ test scores. Based on this, he claims that it would be appropriate to decrease the 1996 score by nearly a standard deviation, or 14 points, due to the presence of an attractive test administrator. (*Id*. at 50.)

The Court finds this theory to be wholly unsupported. Regardless whether incentives can increase IQ scores, Pizzuto has not offered any evidence that he was in fact motived to perform better out of a desire to impress the test administrator; he merely speculates, years after the fact, that this might have been the case.

Even if the theory did apply on these facts, Pizzuto has pointed to no evidence that an incentivized score would be an inaccurate assessment of his full intellectual ability. It is true that Dr. Beaver, Dr. Moore, and Dr. Greenspan have all testified that external factors can lead to higher IQ scores, but the Court understands this testimony to mean that, given incentives, a test-taker can perform considerably better than he or she would on average. A

**MEMORANDUM DECISION AND ORDER - 30**

higher score resulting from peak performance is not the same thing as a *false* score, and there is no evidence before the Court that a test-taker can "fake" a higher score on an objectively scored IQ test to impress a test administrator or to receive some other reward. Logically, incentives of this kind would lead to the test-taker's maximum effort, particularly among those who traditionally score in the low range, which appears to be the import of the study to which Dr. Greenspan referred at the hearing. (Tr., pp. 976-77.)

Aside from the specific IQ test results, a few achievement and aptitude tests are also contained in Pizzuto's school and military records. These tests offer mixed results. In the fifth grade, Pizzuto scored at the fourth grade level on the Stanford Achievement Test, but he was the age of a sixth grader when he took the test. (Plaintiff's Ex. 10.) He appears to have tested near the average on an unspecified standardized test that he took in the same grade, but he scored in the fifth percentile on another test in the seventh grade. (Plaintiff's Ex. 10; Tr., pp. 743-44, 901-04.) Pizzuto scored at the 46th percentile on the Armed Forces Qualifying Test, which he took at age 17. (Tr., p. 746.) Overall, these scores are variable but are generally in the average to below average range. The Court does not place much probative value on this evidence because the circumstances under which these tests were administered, and in two instances the identity of the tests themselves, is unknown.

For these reasons, the Court does not credit the Weinstein score of 60 as an accurate assessment of Pizzuto's measurable general intellectual functioning before he was 18 years of age. The Court instead finds that Pizzuto's intellectual functioning was likely higher than the Emery verbal score of 72 indicates but lower than the Beaver full scale score of

**MEMORANDUM DECISION AND ORDER - 31**

92. This would place him approximately one standard deviation below the mean (about 15 points), most likely somewhere in the 80s, but the Court need not determine a precise numerical score. It is sufficient to say that Pizzuto has not proven by a preponderance of the evidence that his general intellectual functioning at the relevant time was significantly subaverage; that is, that he had an IQ of 70 or below.

### 3. Pizzuto Had Significant Limitations in His Adaptive Functioning in Two or More Skill Areas Before He Was 18 Years Old

In addition to an IQ of 70 or below, Idaho Code § 19-2515A(1) also requires "significant limitations in adaptive functioning in at least two (2) of the following skill areas: communication, self-care, home living, social or interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety." Ordinarily, a petitioner's failure to carry his burden on the intellectual functioning element would eliminate the need to assess whether he could prove significant limitations in adaptive functioning, because both elements must coexist to support a finding of mental retardation. But while these are separate legal elements, conceptually and clinically they can be interrelated, and evidence of adaptive behavior deficits may have some bearing on assessing a person's intellectual functioning in cases with borderline IQ scores. *See* DSM-IV-TR, p. 42 ("[i]t is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior.") The Court does not find this to be a borderline case as to Pizzuto's intellectual functioning. But, out an abundance of caution it will move on to examining his adaptive behavior evidence.

**MEMORANDUM DECISION AND ORDER - 32**

A.     *Standards for Assessing Adaptive Functioning*

Idaho Code § 19-2515A(1) does not define "adaptive functioning" or the ten listed skills areas, nor does it provide a standard for resolving when a person's limitations are "significant." The Idaho Supreme Court had no occasion to consider this element because it concluded that Pizzuto had not established that his IQ was 70 or below.

The DSM-IV-TR, which appears to contain the nearest clinical definition to the Idaho code definition, describes adaptive functioning as "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Id*. at 42. The DSM-IV-TR suggests that "it is useful to gather evidence for deficits from one or more reliable independent sources (e.g., teacher evaluation and educational, developmental, and medical history)." *Id*. Standardized testing can also be used, but these tests are designed for assessing a person's current deficits, and "there is a debate among clinicians whether retrospective assessments are valid for determining adaptive functioning in an *Atkins*-related context." *Wiley v. Epps*, 625 F.3d 199, 217 (5th Cir. 2010).

Ultimately, an opinion about adaptive functioning relies to a greater degree on subjective clinical judgment than reviewing IQ test scores. *United States v. Hardy*, 762 F.Supp.2d 849, 883 (E.D. La. 2010). Although a person's IQ should remain relatively stable, absent a serious cognitive decline, "[e]valuating someone's adaptive behavior, on the other hand, is less stable even in theory, and difficult to assess in practice, and all the

more so when done retrospectively." *Id.* at 882.

      B.    *Discussion of Pizzuto's Adaptive Functioning*

Two of Pizzuto's mental health experts, Dr. Weinstein and Dr. James Patton,

testified in this proceeding that he struggled with significant adaptive functioning

limitations during his developmental years.

Dr. Weinstein administered a formalized test to Elsie Rado, Pizzuto's younger

sister. This test was designed to be given to the parents of children who are suspected of

having intellectual disabilities, but Dr. Weinstein determined that Elsie was the closest

approximation to a parent because she was often left in charge of Pizzuto and the other

children. (Tr., p. 492.) Based on this test, a review of records, and his interviews with

Pizzuto, Elsie, and another sister, Dr. Weinstein found that Pizzuto's adaptive behavior in

"conceptual, social, and practical skills" fell two standard deviations below the mean

before he was 18 years old. (Tr., pp. 495-96.)

Dr. Patton, offered solely as an expert on adaptive functioning, testified that he

found significant deficits in Pizzuto's childhood functioning in five areas or "domains":

functional academics, communication, self-care, social or interpersonal, and leisure. (Tr.,

p. 320.) In reaching his conclusion, Dr. Patton interviewed family members and teachers

who knew Pizzuto during his developmental years, and reviewed school and military

records, but he limited the inquiry to potential deficits that exist before the age of 18. (Tr.,

p. 365.)

Respondent's expert, Dr. Moore, agreed that Pizzuto had adaptive limitations in his

**MEMORANDUM DECISION AND ORDER - 34**

childhood, but Dr. Moore did not believe that the evidence was conclusive enough to find

that they were "significant." (Tr., p. 787.) Dr. Moore discounted the testing instrument

used by Dr. Weinstein, which was not intended to assess functioning retrospectively and

should not have been given to a sibling. (Tr., pp. 784.) Dr. Moore also examined Pizzuto's

behavior over a wider time horizon, extending well into adulthood, and remarked that

Pizzuto's functioning seemed to improve after he left the family home. (Tr., p. 728;

Respondent's Ex. 2122, p. 10.) According to Dr. Moore, this suggested that his limitations

could have been the result of the abusive and chaotic environment in which he was raised

rather than deficits in his intellectual capability. (Tr., pp. 774; Respondent's Ex. 2122, p.

10.)

        After considering these opinions in light of the other evidence before it, the Court

finds that Pizzuto has established that he had significant adaptive limitations in the areas of

(1) functional academics, (2) communication, and (3) social or interpersonal skills during

his developmental years, but not in any other areas or domains. The Court is cognizant that

the family members are relying on their recollections of Pizzuto's behavior from over four

decades ago and that they might have an incentive to shade their recollections toward the

most favorable conclusion. The Court is most persuaded by the lay testimony and expert

opinions that are consistent with contemporaneous school records and the affidavits of

educators who interacted with Pizzuto at the relevant time.

        That evidence shows that Pizzuto grew up in a family that lived a transient and

impoverished lifestyle, moving more than a dozen times during his childhood. Pizzuto and

**MEMORANDUM DECISION AND ORDER - 35**

his siblings were repeatedly and severely abused by their stepfather, Bud Bartholomew, and Pizzuto endured the brunt of this abuse. His mother, Pam, was often literally and figuratively absent, and she did not offer a supportive or nurturing role to counterbalance Bartholomew's abuse. Within this dysfunctional milieu, Elsie assumed a maternal role and cared for her siblings.

Elsie testified that Pizzuto had difficulty with basic school subjects, and she did homework for him when they were both in elementary school. (Tr., pp. 151-53.) Given the family's itinerant existence, school records from Pizzuto's youth are incomplete, but what exists confirms Elsie's recollection and shows that he significantly underperformed even when he was enrolled in classes that contained low-performing children. He was held back twice, and his school records show C's and D's and some failing grades. (Plaintiff's Ex. 10.) In at least two of the schools that he attended, grades that low were rarely given. (Plaintiff's Ex. 2, ¶ 6; Plaintiff's Ex. ¶ 7.) He also scored below the median on a standardized test in the fifth grade, even though he was the chronological age of sixth graders. (Plaintiff's Ex. 5.) Pizzuto attended elementary and secondary schools before special education programs were widespread, but his family members and a teacher who recalled him believed that he would have been an appropriate candidate for special education classes. (Plaintiff's Ex. 3, ¶ 17; Tr., p. 314.) When viewed within the standards expected of children of Pizzuto's relevant age, sociocultural background, and community setting, the Court finds that he has shown significant limitations in his functional academic skills.

**MEMORANDUM DECISION AND ORDER - 36**

There is also sufficient evidence to find that Pizzuto's communication and interpersonal or social skills were significantly behind his peers during his developmental years. His relatives testified that his vocabulary was still limited by the age of ten, and that he would point or gesture instead of speaking. (Tr., pp. 41-42, 132.) Elsie claimed that she had to be very direct with Pizzuto and would "talk down" to him so he could understand, almost as her son rather than her brother. (Tr., p. 166.) The counselor at an alternative high school that Pizzuto attended for the ninth grade described him as "emotionally very immature; developmentally behind other people; outgunned by his peers; annoying; did not appear to have any friends; probably talked out of turn; and was unorganized, unruly and inconsistent." (Plaintiff's Ex. 1, ¶ 6.) Another teacher claimed that he was immature, lacked the ability to interact with his peers, and did not have friends. (Plaintiff's Ex. 5, ¶ 9.)

While the Court believes that Pizzuto may have had limitations in other areas, the evidence is not strong enough to label them "significant." His claims that he had serious problems with self-direction, home living, work, leisure, health and safety relies primarily on anecdotal information from relatives who testified about selected incidents from his childhood. Much of this evidence is also vague as to his age when the incidents occurred, and age-related context is critical; a child in early elementary school may still need help bathing, dressing, playing games, or doing household chores, but a teenager who cannot accomplish these tasks would be far behind his or her peers. It is also not clear whether Pizzuto engaged in some behaviors that were inappropriate or unusual for his age because

**MEMORANDUM DECISION AND ORDER - 37**

of an intellectual deficit or because he simply chose to do so. A poor work history or a tendency to take risks, for example, may be the result of a maladaptive or anti-social personality rather than an intellectual impairment.

Moreover, the Court's finding of significant limitations in childhood adaptive functioning in two or more areas does not mean that Pizzuto is mentally retarded, as he has failed to established that his general intellectual functioning was significantly subaverage. Both limitations must coexist to support a diagnosis, and either one can be present independently of the other. According to Dr. Moore, "there may be some aspects of the – of the adaptive functioning that are due to, you know, personality or psychological factors, other psychological factors other than cognitive slowness." (Tr., p. 739.) Pizzuto's own adaptive functioning expert, Dr. Patton, admitted that one could have "pretty significant deficits in adaptive functioning that don't necessarily have, you know – that – that could be caused by any number of reasons," and he gave Autism Spectrum Disorder as but one example. (Tr., p. 337.)

The Court is also persuaded by Dr. Moore's opinion that a review of Pizzuto's adult behavior can shed some light on the nature of his childhood adaptive deficits. (Tr., p. 722-23.) Adult functioning is relevant because mental retardation is a lifelong intellectual disability, and significant limitations should be seen beginning in childhood and continuing into adulthood, adjusting for age-related expectations of average functional ability. (Tr., pp. 719, 722.) Pizzuto's experts all but ignored evidence of his functioning near the end of his childhood years and the beginning of his adult years, which was

**MEMORANDUM DECISION AND ORDER - 38**

provided perhaps most directly by the deposition testimony of his ex-wife, Pamela Relken. (Tr., p. 12; Respondent's Exhibit 2010c.) Pizzuto married Relken when he was 17 years old, and they began a two-year nomadic existence, wandering from California to Washington and eventually landing in Michigan. (Respondent's Ex. 2010c.)

Relken described Pizzuto as someone who initially was charismatic, warm, and gentle. (Respondent's Ex. 2010c, p. 14.) Relken claimed that Pizzuto could cook and would clean up the kitchen – "[h]e knew his way around the kitchen" – and that they would go shopping together for vintage clothing. (*Id*. at 15.) Pizzuto tried to be a father to Relken's young son, and he would read children's books to the boy. (*Id*. at 29.) According to her, Pizzuto brushed his own teeth, combed is hair, trimmed his mustache, and was "was very clean about himself." (*Id*. at 26.) His work history was spotty but he always seemed to have money, though she never asked where he got it. (*Id*. at 46, 81.) After Pizzuto got into a fistfight with Bartholomew, the relationship changed, and he became more controlling and violent with Relken. (*Id*. at 41.)  Eventually, Pizzuto was arrested in Michigan on a rape charge, and he was sent to prison at the age of 19, where he remained for the next ten years. (*Id*. at 80.)

Later, when Pizzuto was prosecuted for the murders in this case, he spoke at court hearings, cross-examined witnesses, and provided a lengthy allocution at his sentencing hearing, demonstrating a fluency and proficiency in these matters. (Respondent's Ex. 2021, 2035.) He has held clerical jobs and taken educational courses in prison, and he has engaged in games of cribbage and pinochle with fellow inmates. (Tr., p. 867-68.) He reads

**MEMORANDUM DECISION AND ORDER - 39**

science fiction and fantasy novels, and he has written letters to family and friends that show "relatively adequate" communication skills. (Tr., p. 775, 868.)

Focusing on a person's strengths or areas of competence can be misleading, as a mildly mentally retarded person can learn and function very well in some areas, but Pizzuto's overall ability to function at an age-appropriate level across all of the life skill areas listed in Idaho Code § 19-2515A(1) appears to have been much better after he left home. While the evidence may not be conclusive, it lends at least some support to Dr. Moore's observation that "it is likely that environmental factors negatively impacted the progression of his adaptive skills during his developmental years, and that his relative adaptive functioning improved once he was away from these abuse-laden situations." (Respondent's Ex. 2122, p. 10.) Dr. Moore's observation harkens back to Dr. Emery's testimony at the sentencing hearing that Pizzuto's "native intelligence is probably a little higher [than the verbal IQ score] and the limitations we see are a reflection of the circumstances that he grew up in." (State's Lodging A-18, p. 180.)

There is no doubt that Pizzuto was raised in an abusive environment that stunted his ability to thrive. The Court is also aware that mental retardation can be *caused* by that type of environment, but there is no evidence before the Court that significant deficits in adaptive behavior exist *only* in those individuals whose intelligence is also significantly subaverage. If that were true, the definition of mental retardation would not include an intellectual functioning component. The numerous expert opinions through the years about Pizzuto's other psychological, personality, and neurological disorders further

**MEMORANDUM DECISION AND ORDER - 40**

complicate the analysis in this case.

The evidence of Pizzuto's adaptive behavior and intellectual functioning over time defies easy characterization, and the Court makes no specific finding as to cause and effect here. It merely concludes that despite the existence of significant limitations in two or more areas of adaptive functioning during his developmental years, he has not proven that he is mentally retarded and exempt from execution under the Eighth Amendment.

## CONCLUSION

Pizzuto has failed to show that he is entitled to habeas relief, either under the standards set out in 28 U.S.C. § 2254(d) or, alternatively, based on a *de novo* review of all of the evidence in the record. The Successive Petition will be denied.

## CERTIFICATE OF APPEALABILITY

As required by Rule 11 of the Rules Governing Section 2254 Cases, the Court evaluates this case for suitability of a certificate of appealability ("COA").  *See also* 28 U.S.C. § 2253(c).

A habeas petitioner cannot appeal unless a COA has issued. 28 U.S.C. § 2253. A COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

The Court is satisfied that Pizzuto's claim of mental retardation is significant enough that he should at least be given the opportunity to convince the Court of Appeals of its merit. The Court will issue a certificate of appealability over its resolution of the claim. The certificate of appealabilty will also encompass the Court's ruling that required Pizzuto to disclose the 1996 Beaver IQ test results in discovery to Respondent, if a certificate of appealability is needed to appeal from that ruling.[6]

Pizzuto is advised that he must still file a timely notice of appeal in this Court if he intends to pursue an appeal.

## ORDER

**IT IS ORDERED:**

1.    Petitioner's Successive Petition for Writ of Habeas Corpus Seeking Relief Under *Atkins v. Virginia* (Dtk. 1) is DENIED.

2.    The Court issues a certificate of appealability over its decision to deny relief on the merits on Petitioner's *Atkins* claim and over its Memorandum

---

[6] The Court remains unpersuaded by Pizzuto's claim that he was entitled to assert a privilege under Rule 26(b)(4) of the Rules of Civil Procedure based on Dr. Beaver's supposed status as a non-testifying consultant. While the Court finds Respondent's ire at Pizzuto's counsel for failing to disclose that evidence in state court to be misplaced – because Respondent never requested discovery in state court and no evidentiary hearing was held – it finds counsel's privilege argument to be equally misguided. Pizzuto has used Dr. Beaver's opinions on many occasions in state and federal court when it has suited his purposes. More to the point, habeas offers an equitable remedy, and the Court has the flexibility in the manner in which it receives evidence so that it may dispose of a petition as law and justice require. Just as Pizzuto has a compelling interest in not being executed if he is mentally retarded, the State has a compelling interest in seeing that its judgment is enforced if he is not mentally retarded. The 1996 IQ testing is relevant to reaching a fair and accurate result on that critical issue.

Due to the novelty of the discovery issue, however, the Court will grant Pizzuto permission to appeal.

**MEMORANDUM DECISION AND ORDER - 42**

Decision and Order granting Respondent's Motion to Compel (Dkt. 103).

Upon the filing of a timely notice of appeal in this case, and not until such

time, the Clerk of Court shall forward the necessary paperwork to the Court

of Appeals for the Ninth Circuit for the docketing of an appeal in a civil

case.



DATED:  **January 10, 2012**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**MEMORANDUM DECISION AND ORDER - 43**