UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GERALD ROSS PIZZUTO, JR., <br><br> Petitioner, <br><br> v. <br><br> RANDY BLADES, Warden, Idaho Maximum Security Institution, <br><br> Respondent. | Case No. 1:05-cv-516-BLW <br><br> **MEMORANDUM DECISION AND ORDER** <br><br> **CAPITAL CASE** |

The Court previously denied Gerald Ross Pizzuto, Jr.'s Successive Petition for Writ of Habeas Corpus Seeking Relief Under *Atkins v. Virginia*, and Judgment was entered on January 10, 2012. (Dkts. 228, 229.) Pending before the Court is Pizzuto's Motion to Alter or Amend Judgment under Rule 59(e) of the Federal Rules of Civil Procedure. (Dkt. 230.)

For the reasons that follow, the Court will deny the Motion.

**STANDARD OF LAW**

Reconsideration of a final judgment under Rule 59(e) is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003). A losing party cannot use a post-judgment motion to reconsider as a means of litigating old matters or presenting

**MEMORANDUM DECISION AND ORDER - 1**

arguments that could have been raised before the entry of judgment. *School Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

As a result, there are four limited grounds upon which a motion to alter or amend judgment may be granted: (1) the motion is necessary to correct manifest errors of law or fact; (2) the moving party presents newly discovered or previously unavailable evidence; (3) the motion is necessary to prevent manifest injustice; or (4) there is an intervening change in the law. *Turner v. Burlington North. Santa Fe R.R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003) (citation omitted).

## DISCUSSION

Pizzuto seeks reconsideration or correction of the Court's decision on two grounds: first, he contends that the Court misapplied the concept of a standard error of measurement as it pertains to IQ test scores; second, he asserts that the Court erred in discounting, as "ambiguous," Dr. Ricardo Weinstein's test results that were intended to assess the quality of Pizzuto's effort during his most recent intelligence testing.

### 1. The Standard Error of Measurement

The Court discussed the concept of a standard error of measurement as part of its analysis of whether Pizzuto had shown that the Idaho Supreme Court's adjudication of his *Atkins* claim was contrary to or involved an unreasonable application of clearly established federal law. The Court noted that the Idaho Supreme Court "appears to have applied a strict interpretation of the language that the Idaho legislature chose to use, holding that any full scale [IQ test] score above 70 fails as a matter of law, without regard

**MEMORANDUM DECISION AND ORDER - 2**

to a range of error." (Dkt. 228, p. 18.) The Court indicated that it was "troubled by the Idaho Supreme Court's apparent rejection of a standard error of measurement on individual testing instruments," because "[c]ommon sense about the nature of human error suggests that no single number on a test can measure intellectual functioning with absolute pinpoint accuracy." (*Id*.) The Court recognized that "professionals in the field agree that scores on IQ tests fall within a small range on either side of the reported numerical score, usually plus or minus three to five points." (*Id*.)

Pizzuto does not appear to object to those aspects of the Court's opinion. Instead, he bases his argument on the following sentence: "a person who receives a full scale IQ score of 72 on a test may have an *actual* IQ score on that test as low as 67 or as high as 77, and where on this continuum the most likely score lies – above or below 70 – is a question of fact to be decided on all of the evidence presented." (Dkt. 228, p. 19.) (Emphasis in original.) Pizzuto characterizes this sentence as revealing the Court's mistaken belief that a trial court can find a precise numerical IQ score within the range of error, contrary to the accepted practice in the mental health field. The Court is not persuaded that it either misunderstood the concept of a standard error of measurement or, more importantly, that this sentence had any bearing on the Court's material legal conclusions in the case.

Initially, Pizzuto's interpretation of the sentence is curious, given the Court's preceding statements that "no single number on a test can measure intellectual functioning with absolute pinpoint accuracy" and that "professionals in the field agree

**MEMORANDUM DECISION AND ORDER - 3**

that scores on IQ tests fall within a small range on either side of the reported numerical score, usually plus or minus three to five points." In any case, the Court merely intended to illustrate how the Idaho Supreme Court could have allowed for a standard error of measurement on IQ testing while still remaining faithful to Idaho Code § 19-2515A, as follows.

To be entitled to relief under the statute, a defendant must show, in part, that he has "significantly subaverage general intellectual functioning," meaning that he has an "intelligence quotient of seventy (70) or below." Idaho Code § 19-2515A(1)(b). This language could pose a dilemma for a trial court that is confronted with a full scale IQ score that is slightly above 70 on a test that has a recognized range of numerical error that straddles the statutory cut-off. One way to resolve that issue would be for the court to interpret the statute as disqualifying any IQ score that is above 70 without regard to a range of error. Another way would be for the court to take into consideration the standard error of measurement while reviewing the other evidence in the record – for instance, evidence of significant deficits in adaptive functioning – to determine whether the lower end of the range is more likely to be indicative of the defendant's true intellectual functioning. Under that scenario, the court could find that a defendant has proven that his "intelligence quotient is seventy (70) or below," consistent with the statutory language, *even though* the full scale IQ score is slightly above 70 and the range of error extends both above *and* below the cut-off. It would not be necessary to pinpoint the exact number.

**MEMORANDUM DECISION AND ORDER - 4**

This is what the Court meant when it wrote that "where on this continuum the most likely score lies – above or below 70 – is a question of fact to be decided on all of the evidence presented."

Regardless, the point is largely a hypothetical one because the Idaho Supreme Court seems to have rejected the consideration of a standard error of measurement altogether. This Court's material legal conclusion was that Pizzuto had not established that the Idaho Supreme Court's failure to take into account statistical adjustments to IQ scores was contrary to or involved an unreasonable application of *Atkins* or any other clearly established federal law. Pizzuto has offered no reason for the Court to reconsider that part of its decision. To support his argument, he again relies on clinical manuals and practices, but *Atkins* did not constitutionalize clinical standards.

Finally, in the *de novo* section of its opinion, the Court did not make a precise numerical finding as to Pizzuto's IQ score. The Court instead determined that "[i]t is sufficient to say that Pizzuto has not proven by a preponderance of the evidence that his general intellectual functioning at the relevant time was significantly subaverage; that is, that he had an IQ of 70 or below." (Dkt. 228, p. 32.)

**2.      Dr. Weinstein's Tests to Determine Effort and Malingering**

Pizzuto next takes issue with the Court's comment that the results of Dr. Weinstein's tests to determine Pizzuto's effort were "ambiguous, at best." (Dkt. 228, p. 28.) He contends that the test results were not ambiguous and showed good effort. It

**MEMORANDUM DECISION AND ORDER - 5**

appears that Pizzuto is obliquely challenging the Court's finding that the Weinstein IQ test score was to be given the least weight of those in the record, in part because Pizzuto had an incentive to underperform on intelligence testing by the time he was evaluated in this proceeding.

Pizzuto overlooks that the Court did not rely solely on a finding that Dr. Weinstein's effort tests were ambiguous. The Court instead credited as persuasive Dr. Roger Moore's opinion that Pizzuto had an incentive to underperform because (1) Dr. Moore's result on the Test of Memory Malingering ("TOMM") showed that Pizzuto was giving less than optimal performance, (2) *Atkins* raised the stakes significantly for an offender to be found mentally retarded, and (3) such behavior would be consistent with Pizzuto's history of manipulative and deceitful behavior when it furthered his interests. The Court also disregarded as unimportant the testifying experts' divergent opinions about which tests were superior for ferreting out the possibility of feigned mental retardation. The Court was free, as the factfinder, to place whatever weight on the effort tests that it deemed appropriate in light of the record as a whole.

Nor did the Court rely exclusively on evidence that Pizzuto had the potential to underperform when it assessed the weight to be given to the Weinstein IQ score. The Court also took into consideration the lengthy time span between the Dr. Weinstein's testing and Pizzuto's 18th birthday, and Pizzuto's advanced cardiovascular disease, which could have contributed to an overall decline in his cognitive abilities.

Accordingly, the Court is not convinced that it made a clear error of fact or law that requires reconsideration of the Judgment in this matter.

## ORDER

IT IS ORDERED that Petitioner's Motion to Alter or Amend Judgment (Dkt. 230) is DENIED.

DATED: **April 6, 2012**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge