**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GERALD ROSS PIZZUTO, JR., *Petitioner-Appellant*, | No. 12-99002 |
| v. | D.C. No. 1:05-cv-00516-BLW |
| RANDY BLADES, Warden, Idaho Maximum Security Institution, *Respondent-Appellee*. | OPINION |

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted
June 27, 2013—Seattle, Washington

Filed September 9, 2013

Before: Raymond C. Fisher, Ronald M. Gould,
and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Gould

PIZZUTO V. BLADES

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel affirmed the denial of a 28 U.S.C. § 2254 habeas corpus petition challenging a conviction and capital sentence based on *Atkins v. Virginia*, 536 U.S. 304 (2002), which prohibits the execution of mentally retarded persons.

Idaho state law responded to *Atkins* by enacting state law prohibiting the execution of mentally retarded persons and defining "mentally retarded." The Idaho Supreme Court applied that law for the first time in petitioner's case. Observing that the United States Supreme Court in *Atkins* left the definition of "mentally retarded" broadly open for consistent state-court decisions, the panel held that the Idaho Supreme Court's decision was neither contrary to nor an unreasonable application of clearly established federal law.

### COUNSEL

Daniel J. Broderick, Federal Defender; Joseph Schlesinger and Joan M. Fisher (argued), Assistant Federal Defenders, Federal Defender of Eastern District of California, Sacramento, California, for Petitioner-Appellant.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Lawrence G. Wasden, Attorney General of Idaho, and L. LaMont Anderson (argued), Deputy Attorney General, Capital Litigation Unit Chief, Boise, Idaho, for Respondent-Appellee.

## OPINION

GOULD, Circuit Judge:

Gerald Ross Pizzuto, Jr., appeals the district court's denial of his successive petition for a writ of habeas corpus, in which he sought relief based on the United States Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002). In *Atkins*, the Supreme Court held that the Eighth Amendment prohibits the execution of mentally retarded persons.[1] In response to *Atkins*, Idaho enacted a law prohibiting execution of mentally retarded criminals. Pizzuto challenges the Idaho Supreme Court's decision that his execution is not barred under that state law. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253, and we affirm the district court's denial of Pizzuto's petition.

---

[1] The preferred clinical term is now "intellectual disability." *See, e.g.*, Robert L. Schalock et al., *The Renaming of Mental Retardation: Understanding the Change to the Term Intellectual Disability*, 45 Intell. & Dev. Disabilities 116, 116–17 (2007); *see also* Rosa's Law, Pub. L. No. 111-256, 124 Stat. 2643 (2010). We use "mentally retarded" because the parties use that term and because that term was used in *Atkins* and much of its progeny. *See, e.g.*, *Atkins*, 536 U.S. at 306.

## I

Pizzuto was convicted of two counts of first-degree murder, two counts of felony murder, one count of robbery, and one count of grand theft. The Idaho Supreme Court succinctly summarized what it considered key facts of the crime as follows:

> Pizzuto approached [Berta Louise Herndon and her nephew, Delbert Dean Herndon] with a .22 caliber rifle as they arrived at their mountain cabin and made them enter the cabin. While inside, he tied the Her[n]dons' wrists behind their backs and bound their legs in order to steal their money. Some time later, he bludgeoned Berta Herndon to death with hammer blows to her head and killed Del Herndon by bludgeoning him in the head with a hammer and shooting him between the eyes. Pizzuto murdered the Her[n]dons just for the sake of killing and subsequently joked and bragged about the killings to his associates.

*Pizzuto v. State*, 202 P.3d 642, 645 (Idaho 2008); *see also Pizzuto v. Blades*, 673 F.3d 1003, 1004 (9th Cir. 2012). Pizzuto was sentenced to death for the murders.

Pizzuto's conviction and sentence were upheld on direct appeal, except for his robbery conviction, which the Idaho Supreme Court held was a lesser-included offense of felony murder and so merged with that conviction. *See State v. Pizzuto*, 810 P.2d 680, 695 (Idaho 1991). Pizzuto's other convictions and his death sentence were upheld again on state and federal post-conviction review. *See Pizzuto*, 673 F.3d at

1007; *see also Pizzuto v. State*, 233 P.3d 86, 88–89 (Idaho 2010) (reciting the case history).

In his fifth state petition for post-conviction review, relevant here, Pizzuto contended that his death sentence was prohibited by *Atkins*. *See Pizzuto*, 202 P.3d at 644. Pizzuto moved for summary judgment on that issue. But the state trial court granted summary judgment in favor of the State because (1) Pizzuto did not raise a genuine issue of material fact to support his claim of mental retardation and (2) the petition was untimely. *Id.* at 645–46.

The Idaho Supreme Court affirmed the grant of summary judgment to the State. To survive summary dismissal, Pizzuto had to present evidence establishing a prima facie case on each element of the claims on which he bore the burden of proof. *Pizzuto*, 202 P.3d at 650. The Idaho Supreme Court held that "Pizzuto had the burden of showing that at the time of his murders he was mentally retarded as defined in Idaho Code § 19–2515A(1)(a) and that his mental retardation occurred prior to his eighteenth birthday." *Id.* at 655. But Pizzuto did not "create a genuine issue of material fact on each element of his claim" because he did not show that he "had an IQ of 70 or below at the time of the murders and prior to his eighteenth birthday." *Id.* Pizzuto had introduced a verbal IQ test score of 72 and asserted that it should be interpreted as below 70 because the standard error of measurement for the IQ test was plus or minus five points. *Id*. at 651. But the court rejected this argument, concluding that "the legislature did not require that the IQ score be within five points of 70 or below. It required that it be 70 or below." *Id.* The court also noted that Pizzuto's IQ could have decreased in the years between his eighteenth birthday and when he took the IQ test where he scored 72 because of his

lifelong drug use and his health problems. *Id*. at 651–55. The Idaho Supreme Court stressed that Pizzuto did not offer any expert opinion stating that he was mentally retarded at the time of the murders or before the age of 18. *Id*. at 655. The Idaho Supreme Court also affirmed the trial court's implicit denial of an evidentiary hearing. *Id.*

We gave Pizzuto permission to file a successive federal habeas corpus petition on his *Atkins* claim. After careful proceedings, the federal district court denied Pizzuto's habeas corpus petition but granted a certificate of appealability on the *Atkins* issues. *See* 28 U.S.C. § 2253(c). This timely appeal followed.

## II

We review *de novo* the district court's denial of a habeas petition. *Gulbrandson v. Ryan*, 711 F.3d 1026, 1036 (9th Cir. 2013). Review of Pizzuto's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) because Pizzuto filed his petition after April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 322, 336 (1997). Under AEDPA, habeas relief can be granted only if the state-court proceeding adjudicating the claim on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). Under both subsections, our review is significantly deferential to our state-court colleagues' adjudication of the claim. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "The question under AEDPA is not whether a federal court believes the state

court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Id*. (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)); *see also Williams*, 529 U.S. at 409 ("Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.").

We apply this deferential review to the last reasoned state-court decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *see also Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 1262 (2013). Here, we review the Idaho Supreme Court's decision. *See Pizzuto*, 202 P.3d 642. Because that court denied Pizzuto's *Atkins* claim on the merits, Pizzuto can rely only on the record before the state court in order to satisfy the requirements of § 2254(d). *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011); *see also Gulbrandson*, 711 F.3d at 1042. If the state court's adjudication of a claim survives review under § 2254(d), that ends our analysis; the petitioner is not entitled to an evidentiary hearing on that same claim in federal court. *See Pinholster*, 131 S. Ct. at 1398–1401; *cf. Earp v. Ornoski*, 431 F.3d 1158, 1166–67 (9th Cir. 2005) ("Because a federal court may not independently review the merits of a state court decision without first applying the AEDPA standards, a federal court may not grant an evidentiary hearing without first determining whether the state court's decision was an unreasonable determination of the facts.").

### III

Pizzuto contends that the Idaho Supreme Court's decision was an unreasonable application of the law set forth in *Atkins* and an unreasonable determination of the facts. We consider each argument in turn.

### A

Pizzuto contends that the Idaho Supreme Court unreasonably applied *Atkins* and that he should be given relief under 28 U.S.C. § 2254(d)(1). Under § 2254(d)(1), "[t]he pivotal question is whether the state court's application" of the Supreme Court precedent "was unreasonable," *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011), as opposed to merely "incorrect or erroneous," *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *see also Williams*, 529 U.S. at 409–10 (requiring that the state-court decision be an "objectively unreasonable" application of clearly established federal law to grant relief under § 2254(d)). In applying this standard, we "must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Harrington*, 131 S. Ct. at 786.

In reviewing the Idaho Supreme Court's decision, we must first ascertain what is the clearly established law of *Atkins* and then determine whether the Idaho Supreme Court unreasonably applied that law in Pizzuto's case. Pizzuto faces a high barrier on this issue because the Supreme Court, while outlawing the death penalty for mentally retarded persons, left definition of that term broadly open for consistent state-court decisions. And so the Supreme Court gave some leeway to state legislators to craft their own

standard for what constitutes mental retardation.  As we have previously explained:  "The Supreme Court in *Atkins* did not define mental retardation as a matter of federal law.  With respect to mental retardation . . . the Supreme Court left to the states 'the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'"  *Moormann v. Schriro*, 672 F.3d 644, 648 (9th Cir. 2012) (alteration in original) (quoting *Atkins*, 536 U.S. at 317); *see also Hill v. Humphrey*, 662 F.3d 1335, 1339 (11th Cir. 2011) (en banc) ("In *Atkins*, the Supreme Court was careful not to fix the burden of proof or to impose rigid definitions of mental retardation.  Instead, the Court left it to the states to develop 'appropriate' procedures for mental retardation determinations . . . .").  More recently, the Supreme Court reaffirmed that *Atkins* "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation will be so impaired as to fall [within *Atkins*' compass]."  *Bobby v. Bies*, 556 U.S. 825, 831 (2009) (alteration in original) (internal quotation marks omitted); *see also Schriro v. Smith*, 546 U.S. 6, 6–8 (2005) (per curiam).

The "clearly established law" of *Atkins* is its holding "that a person who is mentally retarded may not be sentenced to death."  *Moormann*, 672 F.3d at 648.  But clearly established Supreme Court law does not totally hem in the ability of individual states to define and determine who is mentally retarded.

Idaho responded to *Atkins* by enacting Idaho Code § 19-2515A, which prohibits the execution of mentally retarded persons.  Idaho defines mentally retarded as:

> significantly subaverage general intellectual
> functioning that is accompanied by significant
> limitations in adaptive functioning in at least
> two (2) of the following skill areas:
> communication, self-care, home living, social
> or interpersonal skills, use of community
> resources, self-direction, functional academic
> skills, work, leisure, health and safety. The
> onset of significant subaverage general
> intelligence functioning and significant
> limitations in adaptive functioning must occur
> before age eighteen (18) years.

Idaho Code Ann. § 19-2515A(1)(a). "'Significantly subaverage general intellectual functioning' means an intelligence quotient of seventy (70) or below." § 19-2515A(1)(b).

In Pizzuto's case, the Idaho Supreme Court applied § 19-2515A for the first time. The Idaho Supreme Court's use of this definition was not an unreasonable application of *Atkins* because Idaho's definition of mental retardation "generally conform[s] to the clinical definitions" cited in *Atkins*.[2]

---

[2] We do not read the Idaho Supreme Court's decision as holding that a defendant must present an IQ test score, as opposed to an actual IQ, of 70 or below. If that had been the case, that court could have disposed of Pizzuto's *Atkins* claim simply by noting the existence of Pizzuto's test score. Instead, the Idaho Supreme Court appeared to contemplate that Pizzuto's actual IQ might be 70 or below, despite a test score of 72. As we see it, the Idaho Supreme Court entertained the possibility that Pizzuto could satisfy Idaho's statutory definition of mental retardation through persuasive expert testimony that Pizzuto's true IQ before he was 18 was

536 U.S. at 317 n.22.  For example, in *Atkins*, the Supreme Court cited the American Psychiatric Association's (APA) definition of mental retardation, which requires "significantly subaverage general intellectual functioning . . . that is accompanied by significant limitations in adaptive functioning" and "[t]he onset must occur before age 18 years."  *Id*. at 308 n.3 (quoting APA, *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed. text rev. 2000) [hereinafter, *DSM-IV-TR*]).  The APA says that the IQ cutoff for mental retardation is "approximately 70."  *Id*.

The *Atkins* Court also pointed to several state statutes offering protection to mentally retarded persons, illustrating the national consensus against executing mentally retarded criminals.  536 U.S. at 313–15 & nn.9–15 (citing *inter alia* Ky. Rev. Stat. Ann. § 532.130(2) (1990); Md. Code Ann., Art. 27, § 412(e)(3) (1989); N.C. Gen. Stat. § 15A-2005 (2002); Tenn. Code Ann. § 39-13-203(c) (1990)).  These state statutes use an IQ of 70 as the cutoff for mental retardation. Because Idaho's statute is similar, Idaho's definition of mental retardation has "support" in *Atkins*' "discussions of . . . the state standards" that the Supreme Court looked to when describing the class protected by the Eighth Amendment.  *Panetti v. Quarterman*, 551 U.S. 930, 959 (2007) (rejecting the Fifth Circuit's incompetency standard in part because it lacked support in the "discussions of the common law and the state standards" on which the Supreme Court's incompetency law is based).

---

70 or below.  Also, an IQ test score above 70 taken before the age of 18 would not necessarily preclude a subsequent, but still pre-18, onset of mental retardation as required under Idaho law.

Despite the similarities between Idaho's statute and those relied on by the Supreme Court in *Atkins*, Pizzuto contends that the Idaho Supreme Court's interpretation of § 19-2515A(1) was an unreasonable application of *Atkins* because the Idaho Supreme Court did not consider two statistical adjustments to his IQ score—the Flynn Effect and the standard error of measurement (SEM). Although Pizzuto raises this claim in his discussion of an unreasonable application of *Atkins* under § 2254(d)(1), we believe it is more appropriately discussed as it relates to the factual analysis under § 2254(d)(2). *See* Part III.B.2, *infra*; *Green v. Johnson*, 515 F.3d 290, 300 n.2 (4th Cir. 2008) *(*applying the same statistical adjustments to the § 2254(d)(2) analysis); *but Hooks v. Workman*, 689 F.3d 1148, 1170 (10th Cir. 2012) (applying these adjustments to the legal standard under § 2254(d)(1)). Regardless, *Atkins* does not mandate any particular form of calculating IQs, including the use of either SEM or the Flynn Effect. *See, e.g.*, *Bies*, 556 U.S. at 831; *Atkins*, 536 U.S. at 317; *Workman*, 689 F.3d at 1170 ("[I]t cannot be said that the [state court's] failure to consider and apply the Flynn Effect is contrary to, or an unreasonable application of, clearly established federal law.").

Pizzuto next argues that even if these theories are not mandated by *Atkins*, Idaho's failure to consider them, combined with Idaho's rigid 70-point cutoff for mental retardation, results in a definition that does not sufficiently protect *Atkins*' class. We disagree. Idaho's law is not outside of the "national consensus [that] has developed against" the execution of "offenders possessing a known IQ less than 70." *Atkins*, 536 U.S. at 316. Rather, as shown above, Idaho's law rests comfortably within that consensus. And as stated in *Atkins*: "To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining

which offenders are in fact retarded. . . . Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." 536 U.S. at 317. Idaho is sufficiently within the national consensus in enforcing the substantive protection of *Atkins*. The Idaho Supreme Court's application of *Atkins* was not objectively unreasonable.

## B

Pizzuto next contends that the Idaho Supreme Court's determination of the facts was unreasonable. *See* 28 U.S.C. § 2254(d)(2). He asserts that the state court's fact-finding process was deficient and that the state court's factual findings were not supported by substantial evidence in the state-court record. Pizzuto's burden under § 2254(d)(2) is heavy. "This is a daunting standard—one that will be satisfied in relatively few cases." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).

## 1

Pizzuto urges that the state court's determination of facts was unreasonable because the state court did not hold an evidentiary hearing before denying his state petition for post-conviction review. "In some limited circumstances, we have held that the state court's failure to hold an evidentiary hearing may render its fact-finding process unreasonable under § 2254(d)(2)." *Hibbler*, 693 F.3d at 1147; *see also Taylor*, 366 F.3d at 999–1001. For example, in *Earp*, we held that a state court's determination of facts was unreasonable when it failed to hold an evidentiary hearing because "such a hearing was necessary to make the credibility determination upon which rejection of [the petitioner's] claim depends."

*Earp*, 431 F.3d at 1169. "But we have never held that a state court must conduct an evidentiary hearing to resolve every disputed factual question; such a per se rule would be counter not only to the deference owed to state courts under AEDPA, but to Supreme Court precedent." *Hibbler*, 693 F.3d at 1147 (discussing *Landrigan*, 550 U.S. at 471, 476, where "the Supreme Court held that a state court's rejection of the petitioner's allegations was reasonable for purposes of § 2254(d)(2), even though the state court had not held an evidentiary hearing"); *cf. Lambert v. Blodgett*, 393 F.3d 943, 970 (9th Cir. 2004) ("Although an evidentiary hearing might be evidence of an adjudication on the merits, it is a sufficient, rather than a necessary, condition to AEDPA deference."). The state court does not act unreasonably "so long as the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question." *Hibbler*, 693 F.3d at 1147. "The ultimate issue is whether the state's fact-finding procedures were reasonable; this is a fact-bound and case-specific inquiry." *Id.*

Pizzuto was denied an evidentiary hearing at least in part based on his own litigation choices. After filing his fifth petition for post-conviction review in the state trial court, Pizzuto moved for additional neurological testing and an evidentiary hearing. But at the same time, Pizzuto was appealing the state trial judge's failure to recuse himself, so Pizzuto's counsel said that she could not ask the trial court judge to rule on the motion for an evidentiary hearing. The State moved for summary dismissal of Pizzuto's petition, arguing that Pizzuto's petition was untimely and that, even if the petition was timely, Pizzuto was not entitled to relief because he had not created a genuine issue of material fact as to whether he was mentally retarded under Idaho law. After losing the interlocutory appeal to disqualify the state trial

judge, Pizzuto filed a motion for summary judgment, arguing that based on the evidence already in the record, there was no genuine issue of material fact and that his execution was barred because, as a matter of law, he was mentally retarded. In the alternative, Pizzuto again asked for an evidentiary hearing.

The state trial court granted summary judgment for the State without addressing Pizzuto's motion for an evidentiary hearing, and the Idaho Supreme Court affirmed. The question we must answer is whether this implicit denial of an evidentiary hearing made the fact-finding process deficient under AEDPA—that is, whether the determination of facts was unreasonable based on the specific facts of this case. Under the unique facts of this case, we hold that it was not.

Under Idaho law, where one party moves for summary judgment, the trial court has discretion to grant summary judgment in favor of the opposing party on that same issue. *See Pizzuto v. State*, 202 P.3d at 650 (quoting *Harwood v. Talbert*, 39 P.3d 612, 617 (Idaho 2001)). Here, Pizzuto moved for summary judgment contending that he is mentally retarded under § 19-2515A. In so doing, he argued that the undisputed evidence showed he is mentally retarded as a matter of law. And the State directly addressed the same argument in its briefs before the state trial court as well.

In substance, the two motions—both asking the trial court to summarily decide if there was a genuine issue of fact on whether Pizzuto is mentally retarded—effectively stipulated that the facts in the record were sufficient to decide the case. Under Idaho law, where both parties move for summary judgment "based upon the same evidentiary facts and the same issues and theories, they have effectively

stipulated that there is no genuine issue of material fact and summary judgment is therefor[e] appropriate." *Kromrei v. AID Ins. Co.*, 716 P.2d 1321, 1323 (Idaho 1986); *cf. Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979) ("In other words, this was a trial on a stipulated record and was so intended by the parties.  There are no genuine issues of material facts.  It is a proper case for disposition through summary judgment.").

Pizzuto's summary judgment motion contradicted his request for an evidentiary hearing because his summary judgment motion meant that in his view the facts in the record were sufficient to decide the case.  Pizzuto by filing his summary judgment motion accepted the risk that the trial court could rule in favor of the state, instead of merely denying his motion.  Under Idaho law, "[i]f a trial court denies a party's motion for summary judgment, it has the discretion to grant summary judgment to the opposing party." *Pizzuto*, 202 P.3d at 656. In these circumstances—most notably that under Idaho law the trial court had discretion to treat Pizzuto's summary judgment motion as a concession that the record was compete—it was not unreasonable for the state court to decide the motion for summary judgment without an evidentiary hearing.  "[T]he state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question" because Pizzuto stated that there was no genuine issue of material fact. *Hibbler*, 693 F.3d at 1147.[3]

---

[3] We note that, while Idaho law may grant the trial court the power to treat such a motion for summary judgment as a stipulation that the record is complete, the trial court had the discretion to reject that stipulation and to hold an evidentiary hearing.  Stated another way, the state court could have held an evidentiary hearing notwithstanding Pizzuto's decision to file

Pizzuto also challenges the fact-finding process for two other reasons, neither of which is persuasive. First, he insists that the Due Process Clause and *Panetti v. Quarterman* require states to impose certain procedures before adjudicating an *Atkins* claim. In *Panetti*, the Supreme Court held that "*Ford* [*v. Wainwright*, 477 U.S. 399 (1986),] entitled [a petitioner] to certain procedures not provided in the state court [and] failure to provide these procedures constituted an unreasonable application of clearly established Supreme Court law." 551 U.S. at 948. But the Supreme Court has never held that the procedural requirements announced in *Ford* and *Panetti*—prohibiting executions of incompetent criminals—apply in the context of *Atkins*. Rather, the Supreme Court has repeatedly said that the states are to determine both the substantive and procedural regimes for enforcing *Atkins*.[4] *See, e.g.*, *Bies*, 556 U.S. at 831; *see also Hill*, 662 F.3d at 1359 (holding that, unlike *Atkins*, *Ford*

---

a motion for summary judgment. But on the facts of this case, we conclude that it was not required to do so. If this had been a federal court habeas proceeding under 28 U.S.C. § 2255, and with a similar federal statute defining mental retardation, we might have concluded that Pizzuto's borderline IQ test score, affidavits supporting his case, and his requests for further testing together were sufficient to show that Pizzuto had a sufficiently close case to warrant further evidentiary proceedings. We need not address whether the state court's decision to deny Pizzuto an evidentiary hearing, in the face of the cross motions for summary judgment that had been filed, would have been an unreasonable determination of the facts if Pizzuto had not effectively stipulated that the record was complete.

[4] The Supreme Court has stated that even though it did not dictate procedures for adjudicating mental retardation, those procedures "might, in their application, be subject to constitutional challenge." *Smith*, 546 U.S. at 7. But as we explain here, Idaho's procedures in this case were not unreasonable.

"announced both a substantive Eighth Amendment right and a specific *procedural due process requirement* under the Due Process Clause for incompetency claims"). Neither the Supreme Court nor our court has held that *Ford*'s procedural protections apply to adjudication of an *Atkins* claim. But even if they did, *Ford* permits states to "require a substantial threshold showing . . . to trigger the hearing process." *Ford*, 477 U.S. at 426 (Powell, J., concurring); *see also id*. at 417 (plurality opinion) ("It may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious or repetitive claims of insanity."); *see also Panetti*, 551 U.S. at 948. It is not unreasonable for Idaho to require Pizzuto to make a prima facie showing of mental retardation before providing him with an evidentiary hearing. *See Blue v. Thaler*, 665 F.3d 647, 657 (5th Cir. 2011) ("The states retain discretion to set gateways to full consideration [of *Atkins* claims] and to define the manner in which habeas petitioners may develop their claims."). Here, Pizzuto complains that he had to make a prima facie showing of mental retardation to receive an evidentiary hearing. Such a threshold requirement is not unreasonable.

Second, Pizzuto contends that his equal-protection and due-process rights were violated because Idaho treats his post-conviction *Atkins* claim differently than an *Atkins* claim raised before trial. If Pizzuto had raised his *Atkins* claim before trial, he would have automatically been given an evidentiary hearing under Idaho Code § 19-2515A. But because Pizzuto raised his claim on post-conviction review, his claim is governed by Idaho Code § 19-2719. Under that provision, the state trial court can grant summary judgment for the state, even before an evidentiary hearing, if the petitioner does not make a prima facie showing that he is

entitled to relief. This different treatment, Pizzuto contends, violates his Fourteenth Amendment rights.

Pizzuto's challenge fails for at least the following three reasons. First, we have rejected due-process and equal-protection challenges to Idaho Code § 19-2719. *See Rhoades v. Henry*, 611 F.3d 1133, 1144 (9th Cir. 2010); *Hoffman v. Arave*, 236 F.3d 523 (9th Cir. 2001). Second, if we were to assume that Pizzuto's equal-protection claim was not foreclosed by these cases, nonetheless Pizzuto overlooks that he is not similarly situated to pre-trial defendants—a necessary part of his equal-protection claim—because the state has already obtained his conviction and sentence. *Cf. City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (noting that the Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated should be treated alike"). Third, even if he were similarly situated to pre-trial defendants on the theory that he could not have raised *Atkins* before trial, the classification is not suspect because it is based on conviction status, so the State must only show that its differential treatment is rationally related to a legitimate state interest. *See id*. at 440. Pizzuto is attempting to collaterally attack his sentence, and "the State has a quite legitimate interest in preventing . . . abuses of the writ" by a petitioner who "might attempt to use repeated petitions and appeals as a mere delaying tactic." *Barefoot v. Estelle*, 463 U.S. 880, 895 (1983), *superseded by* AEDPA; *cf. Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993) ("The reason most frequently advanced in our cases for distinguishing between direct and collateral review is the State's interest in the finality of convictions that have survived direct review within the state court system."). The different processes for raising *Atkins* claims are rationally related to Idaho's legitimate interests in

finality and in preventing abuses of the writ. *See Walker v. True*, 399 F.3d 315 (4th Cir. 2005) (holding that Virginia's use of a separate *Atkins* process for criminals whose convictions are final did not violate a petitioner's equal-protection rights). Idaho's capital post-conviction-review process does not violate Pizzuto's due-process or equal-protection rights. *See Rhoades*, 611 F.3d at 1144.

**2**

Pizzuto next contends that even if he was not entitled to an evidentiary hearing, the state court made an unreasonable determination of facts in light of the evidence under § 2254(d)(2). Under § 2254(d), we "'must be particularly deferential to our state-court colleagues' on questions of fact." *Cunningham v. Wong*, 704 F.3d 1143, 1164 (9th Cir. 2013) (quoting *Taylor*, 366 F.3d at 999–1000). We will "not second-guess a state court's fact-finding process unless, after review of the state-court record, [we] determine[] that the state court was not merely wrong, but actually unreasonable." *Id*. (quoting *Taylor*, 366 F.3d at 999).

The Idaho Supreme Court found that Pizzuto did not state a prima facie case of mental retardation because he did not show evidence of an IQ of 70 or below before age 18. *Pizutto*, 202 P.3d at 651. These findings were not unreasonable based on the evidence before the state court. As the district court below noted, "Pizzuto's evidence was exceptionally thin" on the element of whether his IQ was 70 or below before age 18. The record before the Idaho Supreme Court contained only one IQ test score: a verbal IQ test score of 72 on the Wechsler Adult Intelligence Scale Revised, administered in 1985, when Pizzuto was almost 29. *Pizzuto*, 202 P.3d at 651. In the same affidavit reporting that

score, Dr. Emery noted that Pizzuto's IQ score "falls in the borderline range of intellectual deficiency," but that other tests "suggest somewhat higher intellectual potential." Dr. Emery diagnosed Pizzuto as having "borderline intellectual deficiency," a clinical term for subaverage intellectual functioning distinct from mental retardation. *Compare* DSM-IV-TR 39–49 (mental retardation), *with* DSM-IV-TR 740 (borderline intellectual deficiency); *see also* APA, *Diagnostic and Statistical Manual of Mental Disorders* 36–41, 332 (3d ed. 1980). Later, Dr. Emery confirmed his previous diagnosis and concluded, "I guess [Pizzuto's] native intelligence is probably a little higher than that [IQ test score]." Pizzuto presented additional evidence to the state court, such as records of poor performance in school, but no expert opined that this poor performance was proof of an IQ of 70 or below.

In addition, the state-court record contained evidence of Pizzuto's long history of seizures and drug abuse that likely had a negative impact on his intellectual abilities. For example, Dr. Merikangas, who reviewed Pizzuto's medical and psychological records opined that Pizzuto's "long history of poly drug abuse has caused him further neurological dysfunction and has caused him to have substantial defects of mind and reason." And the record showed that in 1996, after a comprehensive neuropsychometric examination, Dr. Beaver concluded that "[t]he combination of Jerry Pizzuto having a seizure disorder, neurocognitive limitations that affect his impulse control and decision-making, combined with the neurotoxic affects [sic] of polysubstance abuse would have significantly impacted his abilities to make appropriate decisions and to control his behavior in an appropriate and community acceptable manner." And in 2004, in a request for more testing, Dr. Beaver again stressed that "patients that have persistent seizure disorders, for example, will decline

over time in their overall mental abilities." Based on this evidence, the Idaho Supreme Court concluded that it was reasonable to infer that Pizzuto's IQ may have declined between age 18—the last time relevant for a diagnosis of mental retardation—and age 29, when his IQ was measured at 72. *See Pizzuto*, 202 P.3d at 652.

Finally, the Idaho Supreme Court analyzed an expert affidavit that Pizzuto had presented to the state trial court in support of his motion for additional psychological testing. The court examined this evidence even though neither party had argued that the affidavit was proof of mental retardation. The Idaho Supreme Court's close examination of the entire record—even reviewing documents not discussed by the parties—tends to support that the court did not overlook or ignore evidence. *See Taylor*, 366 F.3d at 1001.

This is true even though the Idaho Supreme Court did not apply the Flynn Effect to Pizzuto's IQ test scores, and only implicitly considered the standard error of measurement (SEM). The Flynn Effect is a theory that IQ scores increase over time, so that a person who takes an IQ test that has not recently been "normed" may have an artificially inflated IQ score. *See* James R. Flynn, *Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect*, 12 Psychol. Pub. Pol'y & L. 170, 173 (2006). "The standard practice is to deduct 0.3 IQ points per year (3 points per decade) to cover the period between the year the test was normed and the year in which the subject took the test." *Id*. Pizzuto asserts that application of the Flynn Effect to his 1985 verbal score of 72 would result in an IQ below the Idaho statute's cutoff. The standard error of measurement "describes the band of error surrounding an individual's theoretical 'true' score." David Wechsler, *WAIS-R Manual* 31–34 (1981). In other words, the

measurement "estimates the standard deviation of an individual's scores on a test if that person could be tested a large number of times, and effects such as practice and fatigue could be ruled out." *Id.* Pizzuto argues that his "true score" could be as low as 67, while the Idaho Supreme Court noted that the trial court could have inferred a real IQ anywhere in the range between 67 to 77. *Pizzuto*, 202 P.3d at 651.

The Idaho Supreme Court's treatment of these two potential adjustments in determining whether Pizzuto had made a prima facie case of mental retardation was not unreasonable. For one thing, the Flynn Effect is not uniformly accepted as scientifically valid. *See Maldonado v. Thaler*, 625 F.3d 229, 238 (5th Cir. 2010) ("[N]either this court nor the [state court] has recognized the Flynn Effect as scientifically valid."); *see also* Flynn, *supra*, at 174 ("The California court . . . goes further than I would in asserting that the Flynn Effect seems to be generally accepted in the clinical field."). Without more evidence in the record on the need to include an adjustment such as the Flynn Effect in considering the relationship between past IQ tests and a person's true IQ, the Idaho Supreme Court's refusal to apply it is not grounds for reversal here. For another, the Idaho Supreme Court did account for SEM when it noted that there was a range of potential true IQs that could be inferred from Pizzuto's IQ test score. However, without expert testimony supporting the notion that a downward adjustment was the more appropriate inference, they were unwilling to use SEM to infer that Pizzuto's true IQ was at the low end of the range.

We conclude that the Idaho Supreme Court's factual findings were not unreasonable in light of the record before it. Although Pizzuto argues that there may have been "more

reasonable" inferences that could be drawn from the facts in the record, that is not our standard of review under AEDPA. "[I]f permissible inferences could be drawn either way, the state court decision must stand, as its determination of the facts would not be unreasonable." *Hunterson v. DiSabato*, 308 F.3d 236, 250 (3d Cir. 2002).

## IV

We hold that the state court's decision was not unreasonable under either subsection of § 2254(d), and we affirm the district court's denial of Pizzuto's habeas corpus petition.[5]

**AFFIRMED.**

---

[5] Because the state-court decision was not unreasonable under § 2254(d), Pizzuto was not entitled to an evidentiary hearing in the federal district court. *See Pinholster*, 131 S. Ct. at 1398–1401. His challenges to the district court's factual findings and the district court's order compelling disclosure of the allegedly privileged material are moot because under *Pinholster* we could not consider conclusions of the district court on new evidence that was not before the state court.