UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GERALD ROSS PIZZUTO, JR., | Case No. 1:05-cv-00516-BLW |
| Petitioner, | **<u>CAPITAL CASE</u>** |
| v. | **MEMORANDUM DECISION AND ORDER ON REMAND** |
| RANDY BLADES, Warden, Idaho Maximum Security Institution, | |
| Respondent. | |

Petitioner Gerald Ross Pizzuto, Jr., is an Idaho state prisoner under a sentence of

death. Before the Court is Pizzuto's Successive Petition for Writ of Habeas Corpus.[1] The

Successive Petition asserts that Pizzuto is intellectually disabled and, therefore, that his

execution is prohibited by the Eighth Amendment. *See Atkins v. Virginia*, 536 U.S. 304

(2002).[2] The Court previously denied the Successive Petition after a four-day evidentiary

---

[1]     Pizzuto's initial federal petition was denied by this Court in 1997, and the judgment was affirmed by the Ninth Circuit Court of Appeals in 2006. *See Pizzuto v. Ramirez*, Case No. 1:92-cv-00241-BLW (D. Idaho) (Dkt. 90, 130.) This Court later denied Pizzuto's motion for relief from judgment, which was based on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). (*See id.*, Dkt. 149, dated March 22, 2013.) The Ninth Circuit affirmed that decision in April 2015. *Pizzuto v. Ramirez*, 783 F.3d 1171, 1173 (9th Cir. 2015).

[2]     The Supreme Court initially used the term "mentally retarded" to describe those individuals whose execution is prohibited under *Atkins*. However, "intellectually disabled" is the currently-accepted term, which the Court uses in this decision. *See Hall v. Florida*, 134 S. Ct. 1986, 1990 ("This change in

**MEMORANDUM DECISION AND ORDER ON REMAND - 1**

hearing, concluding that Pizzuto was not entitled to habeas relief on his *Atkins* claim, either under 28 U.S.C. § 2254(d) or under de novo review.[3] (Dkt. 228.) The Court later denied Pizzuto's motion to alter or amend the judgment. (Dkt. 233.) Pizzuto appealed.

On September 9, 2013, the Ninth Circuit affirmed this Court's decision, holding that, under 28 U.S.C. § 2254(d), the Idaho Supreme Court's rejection of Pizzuto's *Atkins* claim was not contrary to, or an unreasonable application of, clearly-established Supreme Court precedent, nor was it based on an unreasonable determination of the facts. *Pizzuto v. Blades*, 729 F.3d 1211, 1224 (9th Cir. 2013), *op. withdrawn*, 758 F.3d 1178 (9th Cir. 2014). Shortly thereafter, the Supreme Court granted a writ of certiorari in *Hall v. Florida*, 134 S. Ct. 471 (cert. granted Oct 21, 2013). The Ninth Circuit then withdrew its opinion and deferred submission pending the *Hall* decision. (Dkt. 257.)

In May 2014, the Supreme Court issued its decision in *Hall v. Florida*, 134 S. Ct. 1986 (2014). In *Hall*, the Court held, on review of an *Atkins* claim, that Florida's intellectual disability rule—which prohibited further exploration of a petitioner's *Atkins* claim if the petitioner's intelligence quotient "IQ" test score was above a hard cut-off of 70, without taking into consideration the Standard Error of Measurement (SEM)— violated the Eighth Amendment. *Id*. at 1994-95. That is, the Eighth Amendment requires that if an individual asserting an *Atkins* claim has an IQ test score within the SEM of a

---

terminology is approved and used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders . . . .").

[3]      The evidentiary hearing was held prior to the Supreme Court's decision, in *Cullen v. Pinholster*, that new evidence cannot be presented in federal court with respect to claims adjudicated on the merits in state court. 563 U.S. 170, 180 (2011).

**MEMORANDUM DECISION AND ORDER ON REMAND - 2**

score of 70, that individual must be allowed the opportunity to present other evidence of intellectual disability.

After *Hall*, the Ninth Circuit withdrew its previous opinion in this case, vacated this Court's decision on Pizzuto's *Atkins* claim, and remanded for consideration of the applicability, if any, of *Hall* to the Successive Petition. (Dkt. 261.)

This Court ordered the parties to file supplemental briefs addressing the following issues: "(1) whether *Hall v. Florida* applies retroactively to this case; (2) whether and to what extent *Hall* affects this Court's consideration of Petitioner's claim under 28 U.S.C. § 2254(d)(1) or under de novo review; and (3) whether the previous evidentiary hearing held in this action is sufficient to resolve the issues in this case, whether a new evidentiary hearing is permissible and warranted, what additional evidence should be considered, and what that evidence would show." (Dkt. 265 at 1-2.) The parties have filed their briefing, and the issue is now ripe for decision. (*See* Dkt. 268, 276, 279.)

Having carefully reviewed the record, including the state court record, the Court concludes that the parties have adequately presented the facts and legal arguments in the briefs and record and that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 9.2(h)(5) ("Motions and petitions shall be deemed submitted and shall be determined upon the pleadings, briefs, and record. The court, at its discretion, may order oral argument on any issue or claim."). Accordingly, the Court enters the following Order concluding that the Supreme Court's decision in *Hall v. Florida* does not alter the Court's previous decision in this case.

**MEMORANDUM DECISION AND ORDER ON REMAND - 3**

## STANDARDS OF LAW

**1.     Habeas Corpus Standard of Law**

Federal habeas corpus relief may be granted on claims adjudicated on the merits in a state court judgment when the federal court determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal habeas relief is further limited to instances where the state court's adjudication of the petitioner's claim

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Although a federal habeas court reviews the state court's "last reasoned decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991), a state court need not "give reasons before its decision can be deemed to have been 'adjudicated on the merits'" under § 2254(d). *Harrington v. Richter*, 562 U.S. 86, 100 (2011).

When a party contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

**MEMORANDUM DECISION AND ORDER ON REMAND - 4**

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1), the petitioner must show that the state court—although identifying "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (emphasis omitted).

A federal court cannot grant habeas relief simply because it concludes, in its independent judgment, that the decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694. If there is any possibility that fair-minded jurists could disagree on the correctness of the state court's decision, then relief is precluded by § 2254(d)(1). *Richter*, 562 U.S. at 102. The Supreme Court has emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (internal citation omitted). To be entitled to habeas

relief under § 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White*, 134 S. Ct. at 1702 (internal quotation marks omitted).

Though the source of clearly established federal law must come from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013).

As to the facts, the United States Supreme Court has clarified "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). This means that evidence not presented to the state court may not be introduced on federal habeas review if a claim was adjudicated on the merits in state court and if the underlying factual determination of the state court was not unreasonable. *See Murray v. Schriro*, 745 F.3d 984, 999 (9th Cir. 2014).

When a petitioner contests the reasonableness of the state court's factual determinations, the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable . . . in light of the evidence presented in

**MEMORANDUM DECISION AND ORDER ON REMAND - 6**

the State court proceeding." 28 U.S.C. § 2254(d)(2). A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

The United States Court of Appeals for the Ninth Circuit has identified five types of unreasonable factual determinations that result from procedural flaws that occurred in state court proceedings: (1) when state courts fail to make a finding of fact; (2) when courts mistakenly make factual findings under the wrong legal standard; (3) when "the fact-finding process itself is defective," such as when a state court "makes evidentiary findings without holding a hearing"; (4) when courts "plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim"; or (5) when "the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." *Taylor v. Maddox*, 366 F.3d. 992, 1000-01 (9th Cir. 2004). State court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

This strict deferential standard of § 2254(d) applies to habeas claims except in the following narrow circumstances: (1) where the state appellate court did not decide a properly-asserted federal claim; (2) where the state court's factual findings are unreasonable under § 2254(d)(2); or (3) where an adequate excuse for the procedural default of a claim exists. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). In those circumstances, the federal district court reviews the claim de novo and, as in the pre-

AEDPA era, may draw from both United States Supreme Court and circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).

Under de novo review, if the factual findings of the state court are not unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167. On the other hand, if a state court factual determination is unreasonable, the federal court is not limited by § 2254(e)(1). Rather, the federal district court may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray*, 745 F.3d at 1000.

**2.      Standard of Law Regarding Claims of Intellectual Disability**

The Eighth Amendment to the Constitution prohibits cruel and unusual punishment. U.S. Const., amend. VIII. In 2002, the United States Supreme Court determined that the Eighth Amendment forbids the execution of individuals who were intellectually disabled at the time of their crime. *Atkins*, 536 U.S. at 321. That is, intellectually disabled criminals are "categorically excluded from execution." *Id.* at 318.

A capital habeas petitioner may show that he was intellectually disabled at the time of the crime—and therefore not subject to execution—by establishing the following:

1.      The petitioner has "significantly subaverage intellectual functioning"; and

2.      The petitioner suffers from deficits in adaptive functioning in two of ten listed areas, which means that the petitioner is unable "to learn basic skills and adjust behavior to changing circumstances"; and

**MEMORANDUM DECISION AND ORDER ON REMAND - 8**

3.     The onset of these first two factors—subaverage intellectual
functioning and deficits in adaptive functioning—occurred "during
the developmental period," which means before the age of eighteen.

*Hall*, 134 S. Ct. at 1994; *Atkins*, 536 U.S. at 308 n.3.

In *Atkins*'s wake, many states, including Idaho, passed legislation establishing

procedures for capital defendants to assert that they are intellectually disabled. Although

*Atkins* set forth the general, three-pronged analysis for intellectual disability, it left "to the

States the task of developing appropriate ways to enforce" the rule prohibiting the

execution of the intellectually disabled. 536 U.S. at 317 (internal quotation marks and

alteration omitted). Specifically, *Atkins* did not address how a state must define

"significantly subaverage intellectual functioning" or how such functioning could be

proved. Further, the *Atkins* Court recognized that there was "serious disagreement"

among the States as to the most appropriate method for determining whether a petitioner

was, in fact, intellectually disabled. *Id. Atkins* did not attempt to resolve that

disagreement.

The Supreme Court later clarified *Atkins* in *Hall v. Florida*. The state statute at

issue in *Hall*, as interpreted by the Florida Supreme Court, had defined the first prong of

the *Atkins* test—significantly subaverage intellectual functioning—as an IQ test score of

70 or below, *without* consideration of the SEM of plus or minus five points. *Hall*, 134 S.

Ct. at 1994. If a petitioner could not show an IQ score of 70 or below, he would, as a

matter of law, fail to establish intellectual disability. The Florida statute did not allow

further inquiry into the petitioner's intellectual functioning to determine whether he

satisfied the first prong notwithstanding the IQ test score within the margin for measurement error, nor did it allow inquiry into the other two prongs of the intellectual disability definition. Florida courts took "an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence," and relied "on a purportedly scientific measurement the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise." *Id.* at 1995. The Court will refer to this type of intellectual disability statute as establishing a "hard IQ score cutoff."

Pursuant to *Hall*, rejecting an *Atkins* claim based solely on a hard IQ score cutoff without consideration of the SEM is unconstitutional. Rather, "when a defendant's IQ test score falls within the IQ test's acknowledged and inherent [SEM], the defendant must be able to present additional evidence of intellectual functioning, including testimony regarding adaptive deficits." *Id.* at 2001.[4]

Three main points may be gleaned from *Hall*. First, subaverage intellectual functioning—the first prong of the intellectual disability analysis—can be established by evidence of an IQ score, and an IQ score of 70 or below will satisfy that prong. "Significantly subaverage intellectual functioning" is generally defined by the medical and scientific community as having an IQ that is "approximately two standard deviations below the population mean," which equates to an IQ score of 70 or below. *Hall*, 134 S.

---

[4]      *Hall* did not address the Flynn effect, which refers to the phenomenon that a population's mean IQ score tends to increase over time. (Pet. Brief, Dkt. 268, at 18 n.5.) The Court previously "granted [Pizzuto] the[] adjustments [for both the Flynn effect and the SEM], for the sake of argument," but concluded that these adjustments "still d[id] not get him close to the threshold for significantly subaverage general intellectual functioning." (Dkt. 228 at 30.)

**MEMORANDUM DECISION AND ORDER ON REMAND - 10**

Ct. at 1994 (internal quotation marks and citation omitted). Therefore, the first *Atkins* prong is established by an IQ test score of 70 or below.

Second, an IQ score of 76 or higher means that the individual does not suffer from significantly subaverage intellectual functioning and, therefore, is not entitled to relief under *Atkins*. The medical and scientific community takes the SEM into consideration when determining whether an individual has significantly subaverage intellectual functioning. The SEM is "a unit of measurement" that equates to plus or minus five points on the IQ test score scale. *Id*. at 1995. For example, an IQ test score of 70 indicates a ranged score of somewhere between 65 and 75, *id*., and a test score of 76 indicates a ranged score of 71 to 81. Thus, an individual with an IQ score of 76 or higher would not be diagnosed as intellectually disabled because, under the first prong of *Atkins*, that IQ score is outside the range of error contemplated by the SEM.

Finally, *Hall* resolved the conundrum of an IQ test score between 71 and 75. Because these scores are within the lower range of the SEM, petitioners with such scores might meet the first prong of the intellectual disability analysis—that is, they might have an IQ of 70 or below, which establishes significantly subaverage intellectual functioning—or they might not. What *Hall* makes clear is that petitioners with IQ scores of 71 to 75 must be allowed to present additional evidence of intellectual disability, including additional evidence of subaverage intellectual functioning and evidence of the second and third prongs of the analysis—deficits in adaptive functioning and onset before the age of eighteen. 134 S. Ct. at 2001. A state cannot constitutionally end the inquiry

**MEMORANDUM DECISION AND ORDER ON REMAND - 11**

into intellectual disability simply because the petitioner presents an IQ score of 71 to 75. The IQ test score that Pizzuto presented to the Idaho Supreme Court was a verbal score of 72, resulting from a test administered by Dr. Emery in 1985. Although not a full-scale score,[5] the verbal score of 72 is within the range of scores affected by the *Hall* decision.[6]

Just as important as what *Hall* decided is what *Hall* did not decide. *Hall* did not declare unconstitutional a statute describing the first prong of the intellectual disability test as evidenced by an *IQ* of 70 or below—that is precisely the same definition of significantly subaverage intellectual functioning that the medical and scientific community accepts. Rather, *Hall* decided that an IQ *test score* between 71 and 75, without consideration of the SEM, cannot conclusively establish that the petitioner's IQ is above 70 and that the petitioner therefore does not meet the first prong of *Atkins*. The *Hall* decision applies (1) only to the first prong of an intellectual disability analysis, (2) only to the extent that a petitioner presents an IQ test score of 71 to 75, and (3) only to the extent that the petitioner is prohibited from presenting evidence beyond an IQ test score to establish an IQ of 70 or below, or from presenting evidence as to the second and third prongs of the analysis.

---

[5]     As Dr. Emery testified at this Court's evidentiary hearing, considering that Pizzuto's verbal score was 72, Pizzuto's full-scale score "probably" would have been higher, "given his history." (Dkt. 194, Tr. at 26-27.) Although potentially relevant to the first prong of the intellectual disability analysis, this point is irrelevant to the second and third prongs.

[6]     At the evidentiary hearing in this Court, there was also evidence of two additional IQ scores: (1) a full-scale score of 92, which was obtained as part of Dr. Beaver's 1996 neuropsychiatric testing, and (2) a full-scale score of 60 to 65 (adjusted upwards from 60 to take into consideration Pizzuto's medical problems, which could have caused his intellectual functioning to deteriorate later in life), which was obtained by Dr. Weinstein during a 2009 evaluation.

**MEMORANDUM DECISION AND ORDER ON REMAND - 12**

## DISCUSSION

The parties are familiar with the factual and procedural background of this case. The Court specifically adopts its recitation of the factual and procedural background of this case as stated in its Memorandum Decision and Order dated January 10, 2012. (Dkt. 228.)

For the reasons that follow, *Hall v. Florida* does not affect the Court's previous decision in this case. The Court concludes—under both AEDPA and de novo review—that Pizzuto has failed to satisfy the first and third prongs of the intellectual disability analysis. Thus, Pizzuto is not entitled to relief on his *Atkins* claim.

1. **Assuming without Deciding that *Hall* Is Retroactive, the Idaho Supreme Court's Decision Rejecting Pizzuto's *Atkins* Claim Was Not Objectively Unreasonable under AEDPA**

In *Teague v. Lane*, 489 U.S. 288, 305-10 (1989), the United States Supreme Court held that, in general, new rules of constitutional law do not apply retroactively to cases on collateral review. There are two exceptions to this general rule. First, a new rule applies retroactively if it is a substantive rule—that is, the new rule "places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Id*. at 311 (internal quotation marks omitted). Second, if a new rule is procedural rather than substantive, it applies retroactively only if it is a "watershed rule[] of criminal procedure" that "implicate[s] the fundamental fairness of the trial." *Id*. at 311-12.

The Supreme Court has held that the retroactivity inquiry of *Teague* is distinct from § 2254(d)(1)'s requirement that, to be objectively unreasonable, a state court's

decision must violate federal law that was clearly established at the time of that court's decision. *Horn v. Banks*, 436 U.S. 266, 272 (2002) (per curiam). Therefore, to be eligible for relief under AEDPA, a petitioner must show *both* that the rule he seeks to invoke is retroactive—either because it is not a new rule, it is a substantive rule, or it is a watershed rule of criminal procedure—*and* that the state court's decision violated Supreme Court precedent that was clearly-established at the time of that decision:

> The retroactivity rules that govern federal habeas review on the merits—which include *Teague*—are quite separate from . . . AEDPA; neither abrogates or qualifies the other. If § 2254(d)(1) was, indeed, pegged to *Teague,* it would authorize relief when a state-court merits adjudication 'resulted in a decision that *became* contrary to, or an unreasonable application of, clearly established Federal law, *before the conviction became final*.' The statute says no such thing, and we see no reason why *Teague* should alter AEDPA's plain meaning.

*Greene v. Fisher*, 132 S. Ct. 38, 44 (2011). *See also Demirdjian v. Gipson*, 832 F.3d 1060, 1076 n.12 (9th Cir. 2016) ("Even if applying a rule retroactively would comport with *Teague*, we still must ask whether doing so would contravene section 2254(d)(1) by granting relief based on federal law not clearly established *as of the time the state court render[ed] its decision*.") (internal citations and quotation marks omitted).

Both parties have fully briefed the *Teague* issue, and both make salient points. Neither the Supreme Court nor the Ninth Circuit have addressed whether *Hall* applies retroactively to cases on collateral review. That inquiry is difficult and complex. In this case, however, it is also unnecessary.  Even if *Hall* does apply retroactively, Pizzuto still is not entitled to habeas relief on his *Atkins* claim.

**MEMORANDUM DECISION AND ORDER ON REMAND - 14**

**A.      The Decision of the Idaho Supreme Court**

Idaho's intellectual disability statute requires that an individual seeking relief from

a capital sentence based on intellectual disability show "significantly subaverage general

intellectual functioning." Idaho Code § 19-2515A(1)(a). Like the medical and scientific

community, the statute defines "significantly subaverage general intellectual functioning"

as "an intelligence quotient of seventy (70) or below." *Id.* § 19-2515A(1)(b). The Idaho

statute does not explicitly prohibit consideration of the SEM, nor does it explicitly state

that the only way to prove an IQ is with evidence of an IQ test score. Therefore, on its

face, the Idaho statute could have been interpreted to be consistent with *Atkins* and *Hall*.

*See Hall*, 134 S. Ct. at 1994 ("On its face this statute could be interpreted consistently

with *Atkins* and with the conclusions this Court reaches in the instant case. Nothing in the

statute precludes Florida from taking into account the IQ test's standard error of

measurement . . . .").

However, in adjudicating Pizzuto's *Atkins* claim, the Idaho Supreme Court appears

to have interpreted the statute as prohibiting consideration of the SEM—that is, the Idaho

statute established a hard IQ score cutoff of 70. *Pizzuto v. State*, 202 P.3d 642, 651 (Idaho

2008).[7] Noting that the only record evidence of Pizzuto's IQ was a verbal test score of 72,

---

[7]      As the Court has previously stated,

> while the Idaho Supreme Court noted that the literal language of the
> statute prohibited the consideration of a score above 70, it next
> hypothesized that even if a standard error of measurement were applied,
> '[i]t would be just as reasonable to infer that Pizzuto's IQ . . . was 77 as it
> would be to infer that it was 67.' [*Pizzuto*, 202 P.3d] at 651. It is not
> entirely clear whether the state court's opinion in Pizzuto's case
> precludes consideration of a standard error of measurement in all cases.

the Idaho Supreme Court stated that "the legislature did not require that the IQ score be within five points of 70 or below. It required that it be 70 or below." *Id*. Thus, reasoned the court, Pizzuto had not established significantly subaverage intellectual functioning.

Notwithstanding its determination that Pizzuto had failed to establish a genuine dispute as to subaverage intellectual functioning under the first prong of the intellectual disability analysis, the Idaho Supreme Court then went on to consider the *third* prong of that analysis—onset before the age of eighteen. The court determined that the expert opinions in the record about Pizzuto's mental functioning reasonably supported an inference that his IQ was actually higher than 70 before he was 18 years of age and could have decreased before his IQ was first tested at age 29—which resulted in a verbal IQ score of 72. *Id*. at 651-55. These opinions included (1) Dr. Merikangas's opinion that Pizzuto's "long history of drug use" caused "further neurological dysfunction"; and (2) Dr. Beaver's opinion that Pizzuto's epilepsy and polysubstance abuse could have cause Pizzuto's mental functioning to decline over the nearly eleven years that passed between Pizzuto's eighteenth birthday (on January 11, 1974) and his verbal IQ test (taken on December 12, 1985).

The Idaho Supreme Court emphasized that, to be entitled to the protection of the *Atkins* rule, a petitioner was required to demonstrate that he was intellectually disabled "at the time of the murders and prior to his eighteenth birthday," which Pizzuto had not

---

But because both Pizzuto and Respondent seem to assume that to be the true [sic], the Court will likewise so assume for purposes of this decision.

(Dkt. 228 at 18 n.3.)

**MEMORANDUM DECISION AND ORDER ON REMAND - 16**

done.[8] *Id.* at 655; *see also id.* at 651 ("Pizzuto's argument also requires the district court to infer that Pizzuto's IQ had not decreased during the eleven-year period from his eighteenth birthday to the date of his IQ test. The district court, as the trier of fact, was not required to make that inference, especially in light of the opinions of Pizzuto's experts that his long history of drug abuse and his epilepsy would have negatively impacted his mental functioning."). Therefore, the Idaho Supreme Court denied Petitioner's *Atkins* claim.

> **B.    At the Time of the Idaho Supreme Court's Decision, It Was Not Clearly Established that a Hard IQ Score Cutoff of 70 Violated the Eighth Amendment**

After *Hall*, it is clear that the Idaho Supreme Court's interpretation of Idaho's intellectual disability statute as establishing a hard IQ score cutoff of 70 without considering the SEM is unconstitutional, to the extent that court held that no further evidence of intellectual disability could be presented. However, the question under AEDPA is not whether that interpretation is unconstitutional now, but whether it was *so obviously* unconstitutional, at the time of the Idaho Supreme Court's decision, that all fairminded jurists would have agreed that a hard IQ score cutoff of 70 was unconstitutional. *See Richter*, 562 U.S. at 103.

Before *Hall* was decided, this Court fully analyzed whether the interpretation of a hard cutoff of 70 violated AEDPA in its previous merits decision, as well as its denial of Pizzuto's motion to alter or amend the judgment, and the Court incorporates its reasoning

---

[8]    The state court did not address whether Pizzuto had satisfied the second prong of the intellectual disability inquiry—deficits in adaptive functioning.

**MEMORANDUM DECISION AND ORDER ON REMAND - 17**

in those decisions into its analysis here. (Dkt. 228, 233.) The only applicable Supreme Court precedent issued after those decisions is *Hall*. Therefore, whether the state court's decision violated § 2254(d)(1) turns on whether *Hall*'s rejection of a hard IQ score cutoff of 70 was so clearly required by *Atkins* that it was, essentially, nearly a foregone conclusion.

As the Supreme Court later stated in *Hall*, *Atkins* itself did not provide "definitive procedural or substantive guides for determining when a person who claims [intellectual disability] falls within the protection of the Eighth Amendment." 134 S. Ct. at 1998 (internal quotation marks omitted). Specifically, *Atkins* did not hold that a hard IQ score cutoff was unconstitutional, nor did it plainly require consideration of an IQ test's SEM with respect to the first prong. *See White*, 134 S. Ct. at 1702 ("Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions.") (internal quotation marks and alteration omitted). As this Court previously explained, *Atkins* "did not constitutionalize any specific definition" of significantly subaverage intellectual functioning. (Dkt. 228 at 20.) The *Atkins* Court stated explicitly that it would leave "to the States the task of developing appropriate ways to enforce" the rule against the execution of intellectually disabled criminals. 536 U.S. at 317. *Hall* was essentially a clarification and an extension of *Atkins*. And, as the Supreme Court has instructed, AEDPA does not allow federal courts to extend Supreme Court precedent for purposes of applying clearly-established law. *White*, 134 S. Ct. at 1706.

**MEMORANDUM DECISION AND ORDER ON REMAND - 18**

The *Hall* majority did make several points indicating that its holding flowed

directly from *Atkins*. The Court noted that *Atkins* "twice cited definitions of intellectual

disability which, by their express terms, rejected a strict IQ test score cutoff at 70." *Hall*,

134 S. Ct. at 1998. The *Atkins* Court relied on the definition in the DSM-IV that "mild

[intellectual disability] is typically used to describe people with an IQ level of 50-55 to

approximately 70," and noted that "an IQ *between 70 and 75 or lower* is typically

considered the cutoff IQ score for the intellectual function prong of the [intellectual

disability] definition." *Id.* at 1998-99 (emphasis added) (internal quotation marks and

alteration omitted). Additionally, "*Atkins* itself not only cited clinical definitions for

intellectual disability but also noted that the States' standards, on which the Court based

its own conclusion, conformed to those definitions." *Id.*

However, that the *Hall* majority determined that its repudiation of a hard IQ score

cutoff of 70 flowed directly from *Atkins* does *not* necessarily mean that the

unconstitutionality of such a cutoff was clearly established at the time of the Idaho

Supreme Court's decision. *See Kilgore v. Sec'y, Florida Dep't of Corr.*, 805 F.3d 1301,

1310-11 (11th Cir. 2015) ("[I]f *Hall* 'interpreted' or 'refined' *Atkins*, that does not mean

[*Hall*'s] holding was 'clearly established Federal law' under § 2254(d)(1).").

As the Supreme Court emphasized in *Richter*, "[a] state court's determination that

a claim lacks merit precludes federal habeas relief *so long as fairminded jurists could

disagree* on the correctness of the state court's decision." 562 U.S. at 101 (emphasis

added) (internal quotation marks omitted). In *Hall*, four Supreme Court justices would

**MEMORANDUM DECISION AND ORDER ON REMAND - 19**

have held that Florida's hard IQ score cutoff of 70 did *not* violate the Eighth Amendment. 134 S. Ct. at 2002 (Alito, J., dissenting). Both the majority and dissenting opinions in *Hall* are well-reasoned and well-supported, and this Court cannot say that every fairminded jurist would have agreed with the *Hall* majority at the time the Idaho Supreme Court rendered its decision on Pizzuto's *Atkins* claim.

The holding in *Hall* was by no means a foregone conclusion, and fairminded jurists could have concluded, at the time of the Idaho Supreme Court's decision, that a hard IQ score cutoff of 70 was indeed constitutional. That is, the constitutionality of such a cutoff was not "beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Therefore, the Idaho Supreme Court's refusal to consider the SEM was not contrary to, or an unreasonable application of, the *Atkins* decision, and Pizzuto is not entitled to relief under § 2254(d)(1).

> **C.**      ***Even If It Was Clearly Established, at the Time of the Idaho Supreme Court's Decision, that a Hard IQ Score Cutoff of 70 Was Unconstitutional, the Idaho Supreme Court's Alternative Basis for Rejecting Pizzuto's* Atkins *Claim Was Not Objectively Unreasonable under § 2254(d)(1)***

Even assuming that the Idaho Supreme Court's refusal to consider the SEM violated clearly-established federal law, Pizzuto still cannot demonstrate that he is eligible for relief under § 2254(d)(1). The state supreme court also held Pizzuto did not establish that any subaverage intellectual functioning developed *before* he turned eighteen—the third prong of the intellectual disability analysis. And this alternative conclusion was not contrary to, or an unreasonable application of, clearly-established Supreme Court precedent.

**MEMORANDUM DECISION AND ORDER ON REMAND - 20**

There is no clearly-established Supreme Court precedent as to how a petitioner may prove, or how a court must apply, the age-of-onset requirement. *Hall* did not address the third prong of the intellectual disability inquiry at all. Thus, even assuming Pizzuto satisfies the first prong and does, indeed, have significantly subaverage intellectual functioning, the state court's conclusion that Pizzuto did not satisfy the age-of-onset requirement is not objectively unreasonable under AEDPA, and he is not entitled to relief on his *Atkins* claim.

Pizzuto argues that the Idaho Supreme Court required him to present a "pre-18 70 IQ score" and that *Hall* makes clear that such a requirement unconstitutional. (Dkt. 268 at 15, ECF p. 21.) However, contrary to Petitioner's argument, the state court did not erect a "pre-18 IQ score barrier." (*Id.*) Instead, that court determined that Pizzuto had not provided sufficient evidence that his *IQ*—as opposed to his IQ test score—was 70 or below before he turned eighteen. *Pizzuto*, 202 P.3d at 651 ("[T]here must be evidence showing that [Pizzuto's] *IQ was 70 or below* prior to his eighteenth birthday on January 11, 1974." (emphasis added)). The state court's analysis of the third prong of the intellectual disability test was independent of its analysis of the first prong, and this Court has already rejected Pizzuto's argument on this issue. (Dkt. 228 at 25 n.5 ("Pizzuto also complains that the Idaho Supreme Court's opinion requires evidence of an IQ test score of 70 or below from before an offender's 18th birthday. This Court disagrees and interprets the state court's decision as instead requiring some evidence from which a factfinder could reasonably find that the offender's IQ score would have been 70 or

below before age 18, regardless whether he or she was tested as a child. This is a subtle but important distinction . . . .").)

Concluding that Pizzuto's adult drug use and medical problems were likely responsible for the decline in his intellectual functioning, the Idaho Supreme Court determined that Pizzuto did not suffer from significantly subaverage intellectual functioning prior to his eighteenth birthday. Pizzuto has simply not established that this determination was objectively unreasonable under 28 U.S.C. § 2254(d).

> ### D. The Idaho Supreme Court's Decision Was Not Based on an Unreasonable Determination of the Facts in Light of the Evidence Presented under § 2254(d)(2)

The Court previously concluded Pizzuto had not shown that the Idaho Supreme Court based its decision on an unreasonable finding of fact under § 2254(d)(2). Because the *Hall* question addressed in this decision is a pure question of law that does not alter the factual record, the Court incorporates and adopts its previous analysis on this issue. (*See* Dkt. 228 at 21-26.)

Pizzuto, however, claims that the state court misunderstood *Atkins* and that, when *Atkins* and *Hall* are considered together, it becomes clear that the court's factual findings are unreasonable because those findings were "necessarily skewed" by its mistaken interpretation of *Atkins*. (Dkt. 268 at 18, ECF p. 24.) Pizzuto states that "[t]he facts, summarily and inferentially found, are unreasonable because they are not consistent with clinical definitions and best practices in defining and diagnosing [intellectual disability] as guaranteed by the Eighth Amendment in *Atkins* and *Hall*." (*Id.*)

**MEMORANDUM DECISION AND ORDER ON REMAND - 22**

However, the Idaho Supreme Court carefully considered the evidence in the record and found Pizzuto had not established that any significant subaverage intellectual functioning developed before he turned eighteen years of age. As previously explained, the court relied on credible evidence that Pizzuto's medical problems and drug abuse could very well have caused his intellectual functioning to decline in the eleven years between his eighteenth birthday and the date of the IQ test resulting in a verbal score of 72. In doing so, the state court did not make any unreasonable findings of fact. *See Taylor*, 366 F.3d. at 1000-01 (describing types of unreasonable factual findings).

## 2. On De Novo Review, Pizzuto Has Not Shown Intellectual Disability and, Therefore, Is Not Entitled to Relief under *Atkins*[9]

In addition to concluding that AEDPA barred relief on Pizzuto's *Atkins* claim, this Court also denied Pizzuto's *Atkins* claim after a de novo review. Specifically, Petitioner did not establish the first and third prongs of the analysis—that he had an IQ of 70 or below considering the SEM, thereby suffering from significantly subaverage intellectual functioning, before he turned eighteen.[10] (Dkt. 228 at 26-32.) The Court was presented with three IQ scores: one below 70, one above 90, and one in the grey area between 71 and 75. Considering all the evidence presented, the Court resolved the conflict in that evidence and concluded that Pizzuto did not suffer from significant subaverage intellectual functioning before he turned eighteen. *Cf. Larry v. Branker*, 552 F.3d 356,

---

[9]    Again, for purposes of this decision, the Court assumes without deciding that *Hall* applies retroactively to Pizzuto's case.

[10]    The Court also found that, prior to his eighteenth birthday, Pizzuto had significant deficits in adaptive functioning sufficient to meet the second prong of the intellectual disability analysis. (Dkt. 28 at 32-37.)

**MEMORANDUM DECISION AND ORDER ON REMAND - 23**

371 (4th Cir. 2009), *cert. denied*, 558 U.S. 953 (2009) (holding that a state court's rejection of an *Atkins* claim was reasonable where the state court had evidence of one IQ test score above 70 and one IQ test score below 70).

Pizzuto asks to reopen the evidentiary hearing and present further evidence of intellectual disability. (Dkt. 268 at 44, ECF p. 50.) However, Pizzuto has not convinced the Court that the previous evidentiary hearing was insufficient in any way. Petitioner had an adequate opportunity and a strong incentive to bring forward all his evidence at the evidentiary hearing. Not only has Pizzuto failed to prove that his IQ was 70 or below, but having reviewed all the evidence once again on remand, the Court finds that Pizzuto has also failed to prove that his IQ was *75* or below before he turned eighteen. (See Dkt. 228.) Thus, nothing in *Hall* renders suspect any of the Court's previous findings and conclusions on de novo review.

The Court need not re-invent the wheel and thus incorporates and adopts its previous de novo analysis. For the reasons explained in the Court's decision denying the Successive Petition, as well as its decision denying Pizzuto's motion to alter or amend the judgment (Dkt. 228 & 223), the Court concludes, on de novo review, that Pizzuto has not shown that he suffered from significantly subaverage intellectual functioning at the time of the crime, or that any subaverage intellectual functioning existed prior to Pizzuto's eighteenth birthday. Therefore, Pizzuto has not established that he is intellectually disabled and is not entitled to habeas relief under *Atkins* and *Hall*.

**MEMORANDUM DECISION AND ORDER ON REMAND - 24**

## CONCLUSION

For the reasons set forth above, the Court concludes that *Hall v. Florida* does not alter the Court's previous decision denying the Successive Petition.

## ORDER

**IT IS ORDERED:**

1.      The Court's previous decision, concluding that Pizzuto is not entitled to habeas relief on his claim of intellectual ability (Dkt. 228), is CONFIRMED. The Supreme Court's decision in *Hall v. Florida* does not alter the Court's analysis in this case.

2.      The Court reaffirms its previous issuance of a certificate of appealability as to the intellectual disability claim asserted in the Successive Petition. (*See* Dkt. 228.)

3.      This case is hereby ordered closed.

DATED: **November 28, 2016**

B. Lynn Winmill
Chief Judge
United States District Court