**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GERALD ROSS PIZZUTO, JR.,<br>*Petitioner-Appellant*,<br><br>v.<br><br>KEITH YORDY, Warden, Idaho<br>Maximum Security Institution,<br>*Respondent-Appellee.* | No. 16-36082<br><br>D.C. No.<br>1:05-cv-00516-<br>BLW<br><br>ORDER AND<br>AMENDED<br>OPINION |

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted December 11, 2018
San Francisco, California

Filed August 14, 2019
Amended December 31, 2019

Before: Raymond C. Fisher, Ronald M. Gould
and Johnnie B. Rawlinson, Circuit Judges.

Per Curiam Opinion

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Gerald Ross Pizzuto, Jr.'s successive habeas corpus petition in which Pizzuto challenged, based on *Atkins v. Virginia*, 536 U.S. 304 (2002), the Idaho Supreme Court's 2008 decision that his execution is not barred under an Idaho law prohibiting the execution of intellectually disabled offenders.

Applying 28 U.S.C. § 2254(d)(1), the panel held that the record does not establish that the Idaho Supreme Court's decision was contrary to or involved an unreasonable application of United States Supreme Court precedent. The panel wrote that although the state court's decision was contrary to clinical standards in place at the time, it was not obvious at that time that strict adherence to the clinical standards was required. The panel also wrote that although the state court's requirement of an IQ of 70 or below is contrary to *Hall v. Florida*, 572 U.S. 701 (2014); *Brumfield v. Cain*, 135 S. Ct. 2269 (2015); and *Moore v. Texas*, 137 S. Ct. 1039 (2017), these decisions all postdated the state court's decision, and it was not obvious under *Atkins* alone that, for Eighth Amendment purposes, an individual with an IQ test score between 70 and 75 or lower may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Applying 28 U.S.C. § 2254(d)(2), the panel held that the record does not establish that the Idaho Supreme Court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The panel rejected Pizzuto's contention that the state court's factual determinations are unreasonable merely because the state court did not apply the clinical definitions of intellectual disability. The panel rejected Pizzuto's contention that the state court unreasonably failed to consider his school records as evidence of subaverage intellectual functioning. The panel rejected Pizzuto's argument that the state court unreasonably determined that his IQ could have declined in adulthood due to drug abuse and epilepsy. Regarding Pizzuto's argument that the state court's denial of an evidentiary hearing was based on an unreasonable determination of the facts, the panel wrote that the Idaho Supreme Court never addressed the question of whether Pizzuto raised a reasonable doubt regarding his intellectual capacity, and that the Idaho Supreme Court's failure to apply a "reasonable doubt" standard was not contrary to or an unreasonable application of *Atkins*. The panel wrote that under the circumstances, the denial of an evidentiary hearing did not render the state court's factfinding process unreasonable under § 2254(d)(2)'s highly deferential standard.

Because 28 U.S.C. § 2254(d) is not satisfied, the panel held that the district court properly denied habeas relief. The panel did not need to address Pizzuto's remaining appellate arguments or review his *Atkins* claim de novo. Accordingly, the panel did not address whether Pizzuto is intellectually disabled or whether his execution would violate the Eighth Amendment. The panel wrote that its decision does not

preclude the Idaho courts from reconsidering those questions in light of intervening events.

## COUNSEL

Joan M. Fisher (argued), Assistant Federal Defender; Heather E. Williams, Federal Defender; Office of the Federal Public Defender, Sacramento, California; Bruce D. Livingston and Jonah Horwitz, Assistant Federal Public Defenders, Federal Defenders of Idaho, Capital Habeas Unit, Boise, Idaho; for Petitioner-Appellant.

L. LaMont Anderson (argued), Chief, Capital Litigation Unit; Lawrence G. Wasden, Attorney General; Criminal Law Division, Office of the Attorney General, Boise, Idaho; for Respondent-Appellee.

## ORDER

The panel has voted to deny the petition for panel rehearing. Judge Gould and Judge Rawlinson have voted to deny the petition for rehearing en banc and Judge Fisher has so recommended.

The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc, filed November 27, 2019 (Dkt. 71), are denied.

The opinion filed August 14, 2019, and reported at 933 F.3d 1166, is amended. An amended opinion is filed concurrently with this order.

No further petitions for rehearing may be filed.

## OPINION

PER CURIAM:

Gerald Ross Pizzuto, Jr., appeals the district court's denial of his successive petition for a writ of habeas corpus, in which he sought relief based on the United States Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002). In *Atkins*, the Supreme Court held that the Eighth Amendment prohibits the execution of intellectually disabled persons.[1] In response to *Atkins*, Idaho enacted a law prohibiting the execution of intellectually disabled offenders. *See* Idaho Code § 19-2515A. Pizzuto challenges the Idaho Supreme Court's decision that his execution is not barred under that state law. *See Pizzuto v. State* (*Pizzuto I*), 202 P.3d 642 (Idaho 2008). We have jurisdiction under 28 U.S.C. §§ 1291 and 2253, and we affirm the district court's denial of Pizzuto's petition. Because the record does not establish that the state court's adjudication of Pizzuto's *Atkins* claim resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in

---

[1] We use the current clinical terms, intellectually disabled and intellectual disability, except when quoting from sources using the former terms, mentally retarded and mental retardation.

6 PIZZUTO V. YORDY

light of the evidence presented in the State court proceeding," habeas relief may not be granted. *See* 28 U.S.C. § 2254(d). Because habeas relief is barred under § 2254(d), we do not address whether Pizzuto is intellectually disabled, nor whether his execution would violate the Eighth Amendment.

## BACKGROUND

In 1986, a state trial court judge sentenced Pizzuto to death for the murders of Berta Herndon and her nephew Del Herndon. *See Pizzuto I*, 202 P.3d at 645. The Idaho Supreme Court summarized the murders as follows:

> Pizzuto approached [the Herndons] with a .22 caliber rifle as they arrived at their mountain cabin and made them enter the cabin. While inside, he tied the Her[n]dons' wrists behind their backs and bound their legs in order to steal their money. Some time later, he bludgeoned Berta Herndon to death with hammer blows to her head and killed Del Herndon by bludgeoning him in the head with a hammer and shooting him between the eyes. Pizzuto murdered the Her[n]dons just for the sake of killing and subsequently joked and bragged about the killings to his associates.

*Id.*[2]

---

[2] The Idaho Supreme Court's 2008 decision attributes Del Herndon's shooting to Pizzuto. *See Pizzuto I*, 202 P.3d at 645. The Idaho Supreme Court's 1991 decision, by contrast, attributes the shooting to James Rice, one of Pizzuto's accomplices. *See State v. Pizzuto*, 810 P.2d 680, 687 (Idaho 1991), *overruled on other grounds by State v. Card*, 825 P.2d 1081

Sixteen years later, the Supreme Court decided *Atkins*, holding that executions of intellectually disabled persons constitute "cruel and unusual punishments" prohibited by the Eighth Amendment to the United States Constitution. *See* U.S. Const. amend. VIII. Citing "powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal," the Court concluded that "a national consensus has developed against" such executions. *Atkins*, 536 U.S. at 316.

The Court, however, did not adopt any single definition of intellectual disability. It noted that states' "statutory definitions of mental retardation [we]re not identical, but generally conform[ed] to the clinical definitions set forth" by the American Association on Mental Retardation (AAMR) and the American Psychiatric Association. *See id.* at 317 n.22. At the time, the AAMR – now known as the American Association on Intellectual and Developmental Disabilities (AAIDD) – defined intellectual disability as follows:

> *Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and

(Idaho 1991). In his petition for rehearing, Pizzuto contends that the 1991 decision is factually accurate and the 2008 decision is not, and we have no reason to question Pizzuto's contention. The question is immaterial to our analysis.

work. Mental retardation manifests before age 18.

*Id.* at 308 n.3 (quoting AAMR, Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992)). The American Psychiatric Association's definition was similar:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.

*Id.* (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000) (DSM-IV)). The Court noted that "an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition," *id.* at 309 n.5, and that "'[m]ild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70," *id.* at 308 n.3 (quoting DSM-IV at 42–43).

*Atkins*, however, did not expressly adopt these clinical definitions of intellectual disability. The Court instead left that question to the states:

> To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in *Ford v. Wainwright*, 477 U.S. 399 (1986), with regard to insanity, "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.*, at 405, 416–417.

*Id.* at 317 (alterations in original).

Shortly after the *Atkins* decision, Idaho adopted a statute prohibiting imposition of the death penalty for intellectually disabled offenders. *See* 2003 Idaho Sess. Laws 399 (codified at Idaho Code § 19-2515A(3)). The statute defines intellectual disability as follows:

> (a) "Mentally retarded" means significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two (2) of the following skill areas: communication,

> self-care, home living, social or interpersonal
> skills, use of community resources, self-
> direction, functional academic skills, work,
> leisure, health and safety. The onset of
> significant subaverage general intelligence
> functioning and significant limitations in
> adaptive functioning must occur before age
> eighteen (18) years.
>
> (b) "Significantly subaverage general
> intellectual functioning" means an
> intelligence quotient of seventy (70) or below.

*Id.* at 398 (codified at Idaho Code § 19-2515A(1)).

In light of *Atkins*, Pizzuto filed a fifth petition for state post-conviction relief, challenging his death sentence on the ground that he was intellectually disabled. *See Pizzuto I*, 202 P.3d at 645. In July 2003, the state moved to summarily dismiss Pizzuto's petition. *See id.* at 646. In August 2003, Pizzuto moved to disqualify the state trial court judge. *See id.* In October 2004, Pizzuto moved for additional psychological testing, asking that he be transported to an appropriate medical facility for testing in connection with a neuropsychiatric evaluation by Dr. James R. Merikangas. Pizzuto did not notice the motion for a hearing, however. *See*

*id.* at 655.[3]  In January 2005, the state trial court denied the motion for disqualification.  *See id.* at 646.

In seeking dismissal of Pizzuto's petition, the state argued that the petition was untimely under Idaho law and, alternatively, that Pizzuto had failed to establish a prima face case of intellectual disability under the new Idaho statute.[4] With respect to the latter contention, the state noted that there were three elements of intellectual disability – subaverage intellectual functioning, significant limitation in adaptive functioning and an onset before age 18.  With respect to the first criterion, the state noted that Pizzuto had "a verbal IQ of 72" – based on an IQ test administered by Dr. Michael Emery in 1985 – but that "[t]he Statute says 70 or below," and "72 is not 70 or below."  In addition, because Pizzuto's IQ score of 72 was obtained when he was 28 years old, the state argued that "we have no indication of what his IQ was – no testing, at least – what his IQ . . . was before his 18th birthday."  The state noted that the court had "no evidence of an IQ test prior to age 18."

---

[3] It is not clear why Pizzuto did not notice the motion for a hearing. At an April 2005 hearing, "Pizzuto's counsel stated that she could not ask the district court to rule on her motion for testing, apparently because she believed the judge should be disqualified from presiding in the case and therefore from ruling on the motion."  *Pizzuto I*, 202 P.3d at 655 & n.8. Counsel for Pizzuto apparently concluded that, because the court had erroneously denied the motion to disqualify, any order entered by the court on the question of testing would be void.

[4] Initially, the state also argued for summary dismissal on the ground that, as a matter of state law, *Atkins* did not apply retroactively.  *See Pizzuto I*, 202 P.3d at 646.  The state subsequently abandoned that argument, however.

Pizzuto both opposed the state's motion for summary dismissal and, in September 2005, moved for summary judgment, arguing that he had, as a matter of law, established a prima facie case of intellectual disability. *See id.* Pizzuto argued that the state trial court should deny the state's motion for summary dismissal and grant his motion for summary judgment. In the alternative, Pizzuto argued that his October 2004 motion for additional testing should be granted and the matter set for trial. *See id.* at 655–56 & n.9.

In addressing whether Pizzuto had made a prima facie showing of intellectual disability under the Idaho statute, both sides recognized that Idaho's requirement of an IQ of 70 or below was inconsistent with the AAMR and American Psychiatric Association clinical standards in effect at the time. Counsel for Pizzuto, however, acknowledged that *Atkins* did not "dictate what retardation is," while counsel for the state emphasized that "[t]he United States Supreme Court said that the states were permitted to define mental retardation . . . basically as they saw fit." The state recognized that the DSM and AAMR manual "talk[ed] about . . . a 70 IQ plus or minus five," but the state emphasized that "the Idaho Statute doesn't say that. [Section] 19-2515A is very specific, 70 or below. It doesn't say plus or minus five. Seventy or below, period, end of story." The state observed that "some states have actually gone below the 70 and one state . . . has gone to 75." But "Idaho chose 70."

The state argued, moreover, that the margin of error was of no use to Pizzuto, because his "actual" IQ was as likely to be 77 as 67:

> [Section] 2515A says that if the Court finds by a preponderance of the evidence that the

> defendant is mentally retarded –
> preponderance of the evidence, more likely
> than not, . . . something over 50 percent.
> Well, isn't it just as likely that Pizzuto's IQ is
> 77 as opposed to 67?    That's not a
> preponderance of the evidence.  So, you have
> to go with the 72 and that's the only number
> that this Court has before it, the only number.

In December 2005, after a hearing on the motions, the state trial court dismissed Pizzuto's petition on the grounds that it had not been timely filed under state law and that Pizzuto had failed to raise a genuine issue of material fact supporting his claim of intellectual disability.  *See id.* at 646. Pizzuto timely appealed to the Idaho Supreme Court.  *See id.*

In a 2008 decision, the Idaho Supreme Court affirmed the state trial court's denial of Pizzuto's *Atkins* claim.  *See Pizzuto I*, 202 P.3d 642.  The court noted that, to survive summary dismissal, Pizzuto had to present evidence establishing a prima facie case – i.e., enough evidence to allow the factfinder to infer the fact at issue and rule in his favor – on each element of his claim under § 19-2515A(1). *See id.* at 650.  The court interpreted the Idaho statute as requiring proof of three elements: "(1) an intelligence quotient (IQ) of 70 or below; (2) significant limitations in adaptive functioning in at least two of the ten areas listed; and (3) the onset of the offender's IQ of 70 or below and the onset of his or her significant limitations in adaptive functioning both must have occurred before the offender turned age eighteen." *Id.* at 651.

The court concluded that Pizzuto failed to establish a prima facie case as to the first element – an IQ of 70 or

below. The record reflected only a single IQ test score for Pizzuto, a score of 72 on the test administered by Dr. Emery in December 1985, shortly before Pizzuto's 29th birthday. *See id.* The court acknowledged Pizzuto's argument that "an IQ score is only accurate within five points," but it found "two problems" with Pizzuto's argument that "his actual IQ could have been five points lower or higher than 72": first, it would be just as reasonable for the state trial court to infer that his actual IQ was 77 as it would be to infer that it was 67; second, the state trial court was permitted to infer that his IQ had decreased during the 11 years between his 18th birthday and the date of his IQ test. *Id.*[5]

---

[5] The Idaho Supreme Court noted that the state trial court was permitted to draw inferences in favor of the state when considering whether to grant summary judgment to the state. *See Pizzuto I,* 202 P.3d at 650 (citing *Shawver v. Huckleberry Estates, L.L.C.*, 93 P.3d 685, 691–92 (Idaho 2004)). It is not clear whether this line of authority – *see, e.g., Stafford v. Klosterman,* 998 P.2d 1118, 1119 (Idaho 2000); *E. Idaho Agr. Credit Ass'n v. Neibaur,* 944 P.2d 1386, 1389 (Idaho 1997); *Wells v. Williamson,* 794 P.2d 626, 629 (Idaho 1990); *Riverside Dev. Co. v. Ritchie,* 650 P.2d 657, 661 (Idaho 1982) – applies where, as here, the nonmoving party has made clear that it does not consider the record fully developed. *See Pizzuto I,* 202 P.3d at 656 n.9; *cf.* 10A Charles Alan Wright et al., Federal Practice and Procedure § 2720 (4th ed. 2019) (describing, in the text accompanying note 15, the comparable practice under federal procedure); *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco,* 329 F.3d 359, 362 (4th Cir. 2003); *Matter of Placid Oil Co.,* 932 F.2d 394, 398 (5th Cir. 1991); *Fox v. Johnson & Wimsatt,* 127 F.2d 729, 737 (D.C. Cir. 1942). It also is not clear whether the state trial court in fact drew inferences in favor of the state; the state trial court's ruling says only that "Pizzuto failed to raise a genuine issue of material fact supporting his claim of mental retardation." Pizzuto, however, does not raise these questions in his opening brief, and so we do not address them.

The court noted that Pizzuto "did not offer any expert opinion" showing that he "had an IQ of 70 or below at the time of the murders and prior to his eighteenth birthday." *Id.* at 655. Accordingly, the court held that the trial court did not err in granting summary judgment to the state. *See id.*

We granted Pizzuto permission to file a successive federal habeas petition on his *Atkins* claim. After additional testing and an evidentiary hearing, the federal district court denied Pizzuto's petition. *See Pizzuto v. Blades* (*Pizzuto II*), No. 1:05-CV-516-BLW, 2012 WL 73236, at *21 (D. Idaho Jan. 10, 2012). We initially affirmed. *See Pizzuto v. Blades* (*Pizzuto III*), 729 F.3d 1211, 1224 (9th Cir. 2013).

While Pizzuto's petition for rehearing was pending, however, the Supreme Court decided *Hall v. Florida*, 572 U.S. 701 (2014). In *Hall*, the Supreme Court considered a Florida law defining intellectual disability "to require an IQ test score of 70 or less. If, from test scores, a prisoner is deemed to have an IQ above 70, all further exploration of intellectual disability is foreclosed." *Id.* at 704. The Court held that "[t]his rigid rule . . . creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional." *Id.*

At the outset, the Court held that, "[i]n determining who qualifies as intellectually disabled, it is proper to consult the medical community's opinions." *Id.* at 710. The Court explained that "[t]he legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework." *Id.* at 721.

Next, once again turning to the clinical definitions established by the AAMR and the American Psychiatric Association, the Court explained that "the medical community defines intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during the developmental period." *Id.* at 710 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013) (DSM-5)).

With respect to the first criterion, the Court recognized that IQ test scores may be "of considerable significance." *Id.* at 723. The Court emphasized, however, that, "in using these scores to assess a defendant's eligibility for the death penalty, a State must afford these test scores the same studied skepticism that those who design and use the tests do, and understand that an IQ test score represents a range rather than a fixed number." *Id.* Because "[e]ach IQ test has a 'standard error of measurement'" of plus or minus five points, "an individual's intellectual functioning cannot be reduced to a single numerical score." *Id.* at 713. Thus, "IQ test scores should be read not as a single fixed number but as a range." *Id.* at 712. "A score of 71, for instance, is generally considered to reflect a range between 66 and 76 . . . ." *Id.* at 713.[6]

---

[6] Although the standard error of measurement applicable here, as in *Hall*, is plus or minus five points, that is not always the case. *See* AAIDD, Intellectual Disability: Definition, Classification, and Systems of Supports 36 (11th ed. 2010) (AAIDD-11) (noting that the standard error of measurement "varies by test, subgroup, and age group . . . . For well-standardized measures of general intellectual functioning, the standard error of measurement is approximately 3 to 5 points.").

A court, therefore, may not cut off the inquiry when a defendant scores between 70 and 75 on an IQ test. Rather, "[f]or professionals to diagnose – and for the law then to determine – whether an intellectual disability exists once the [standard error of measurement] applies and the individual's IQ score is 75 or below the inquiry would consider factors indicating whether the person had deficits in adaptive functioning." *Id.* at 714. The Court "agree[d] with the medical experts that when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id.* at 723.[7]

The Court held that Florida's "strict IQ test score cutoff of 70" ran afoul of these requirements in two ways. First, it

---

[7] As the DSM-5 explains:

> Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65–75 (70 ± 5). . . . IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks. For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is needed in interpreting the results of IQ tests.

DSM-5 at 37.

"disregard[ed] established medical practice" by "tak[ing] an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence." *Id.* at 712. Second, it "relie[d] on a purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise." *Id.*

In reaching this conclusion, the Court rejected any suggestion that *Atkins* had given states "unfettered discretion to define" intellectual disability. *Id.* at 719. The Court said that "[t]he clinical definitions of intellectual disability, which take into account that IQ scores represent a range, not a fixed number, were a fundamental premise of *Atkins*." *Id.* at 720. The Court added:

> If the States were to have complete autonomy to define intellectual disability as they wished, the Court's decision in *Atkins* could become a nullity, and the Eighth Amendment's protection of human dignity would not become a reality. This Court thus reads *Atkins* to provide substantial guidance on the definition of intellectual disability.

*Id.* at 720–21.

Finally, in conducting a survey of state laws respecting the execution of intellectually disabled offenders, *Hall* briefly distinguished Idaho law from Florida's strict IQ test score cutoff. Citing the Idaho Supreme Court's decision in Pizzuto's case, the Court characterized Idaho law as "allowing a defendant to present additional evidence of

intellectual disability even when an IQ test score is above 70." *Id.* at 717 (citing *Pizzuto I*, 202 P.3d at 651).[8]

In light of *Hall*, we withdrew our opinion, vacated the judgment of the district court and remanded this case to the district court. *See Pizzuto v. Blades* (*Pizzuto IV*), 758 F.3d 1178 (9th Cir. 2014).

On remand, the district court concluded that *Hall* did not alter its previous decision. *See Pizzuto v. Blades* (*Pizzuto V*), No. 1:05-cv-00516-BLW, 2016 WL 6963030, at *11 (D. Idaho Nov. 28, 2016). The court reasoned that relief was not available under § 2254(d)(1), because *Hall* was not clearly established law at the time of the state court decision and, even if it were, the state court's alternative basis for denying relief was reasonable. *See id.* at *6–10. The court also incorporated its previous conclusion that the state court's decision was not based on an unreasonable determination of

---

[8] Idaho's IQ requirement is less restrictive than the Florida requirement at issue in *Hall* because, whereas Florida required an IQ *test score* of 70, Idaho requires an "actual IQ" of 70. *See Pizzuto I*, 202 P.3d at 651. Under the Florida rule, an individual with an IQ test score of 71 is altogether barred from establishing intellectual disability. Under the Idaho rule adopted in Pizzuto's case, that individual could establish subaverage intellectual functioning if he could somehow show that his IQ test score overstated his "actual IQ." Ultimately, however, requiring an individual to establish an "actual IQ" of 70 in order to satisfy the intellectual functioning prong of the intellectual disability definition suffers from a similar infirmity as the Florida rule – it fails to recognize that "an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition," *Atkins*, 536 U.S. at 309 n.5, and it fails to recognize that, "when the lower end of [an IQ] score range falls at or below 70, [a court must] move on to consider [the individual's] adaptive functioning," *Moore v. Texas*, 137 S. Ct. 1039, 1049 (2017).

the facts under § 2254(d)(2). *See id*. at *10. Finally, after reviewing the evidence again on remand, the district court concluded that Pizzuto was not entitled to relief even under de novo review. *See id*. at *10–11. This timely appeal followed.

In briefing this appeal, the parties have discussed not only *Atkins* and *Hall* but also the Supreme Court's more recent decisions in *Brumfield v. Cain*, 135 S. Ct. 2269 (2015), and *Moore v. Texas* (*Moore I*), 137 S. Ct. 1039 (2017). In *Brumfield*, the Court reiterated that "an IQ test result cannot be assessed in a vacuum" and again held, as in *Hall*, that "it is unconstitutional to foreclose 'all further exploration of intellectual disability' simply because a capital defendant is deemed to have an IQ above 70." 135 S. Ct. at 2277–78 (quoting *Hall*, 572 U.S. at 704). The Court also concluded that the state court's rejection of the petitioner's request for an evidentiary hearing on his *Atkins* claim was based on an "unreasonable determination of the facts" under § 2254(d)(2). *See id.* at 2276.

In *Moore I*, the Court reaffirmed *Hall*'s holding that "adjudications of intellectual disability should be 'informed by the views of medical experts.'" 137 S. Ct. at 1044 (quoting *Hall*, 572 U.S. at 721). The Court explained:

> Even if "the views of medical experts" do not "dictate" a court's intellectual-disability determination, . . . the determination must be "informed by the medical community's diagnostic framework." . . . . *Hall* indicated that being informed by the medical community does not demand adherence to everything stated in the latest medical guide.

>   But neither does our precedent license disregard of current medical standards.

*Id.* at 1048–49 (citations omitted) (quoting *Hall*, 572 U.S. at 721). Thus, the Court held that "[t]he medical community's current standards supply one constraint on States' leeway in this area." *Id.* at 1053.

*Moore I* also reaffirmed *Hall*'s holding that courts must "continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits." *Id.* at 1050. In *Moore I*, the petitioner's average score on six IQ tests was 70.66. *See id.* at 1045. Thus, the Court held that, "[b]ecause the lower end of Moore's score range falls at or below 70, the [state court] had to move on to consider Moore's adaptive functioning." *Id.* at 1049 (citing *Hall*, 572 U.S. at 723).

After briefing for this appeal was completed, the Supreme Court has twice more reviewed *Atkins* claims. In *Shoop v. Hill*, 139 S. Ct. 504 (2019) (per curiam), the Court "consider[ed] what was clearly established regarding the execution of the intellectually disabled in 2008." 139 S. Ct. at 506–07. The Court observed that "*Atkins* gave no comprehensive definition of 'mental retardation' for Eighth Amendment purposes"; although *Atkins* cited the definitions of intellectual disability adopted by the AAMR and the American Psychiatric Association approvingly, it "left 'to the State[s] the task of developing appropriate ways to enforce the constitutional restriction'" on executing intellectually disabled persons. *Id.* at 507 (alteration in original) (quoting *Atkins*, 536 U.S. at 317).

In the second case, *Moore v. Texas* (*Moore II*), 139 S. Ct. 666 (2019) (per curiam), the Court reaffirmed its holding in *Moore I* that the petitioner, with an average IQ score of 70.66, "had demonstrated sufficient intellectual-functioning deficits" under the first criterion of the clinical definition of intellectual disability "to require consideration of the second criterion – adaptive functioning." *Id.* at 668 (citing *Moore I*, 137 S. Ct. at 1048–50).

## STANDARD OF REVIEW

We review de novo the district court's denial of a habeas petition. *See Curiel v. Miller*, 830 F.3d 864, 868 (9th Cir. 2016). Review of Pizzuto's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) because Pizzuto filed his petition after April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 322, 336 (1997). Under AEDPA, habeas relief can be granted only if the state court proceeding adjudicating the claim on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

"[A] decision by a state court is 'contrary to' [the Supreme Court's] clearly established law if it 'applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent.'" *Price v. Vincent*, 538 U.S. 634, 640 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362,

405–06 (2000)). "[A] state-court decision involves an unreasonable application of th[e Supreme] Court's precedent if the state court identifies the correct governing legal rule from th[e Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. To satisfy this requirement, the record "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). Turning to § 2254(d)(2), "we may only hold that a state court's decision was based on an unreasonable determination of the facts if 'we [are] convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.'" *Murray v. Schriro*, 745 F.3d 984, 999 (9th Cir. 2014) (alteration in original) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *abrogated on other grounds as stated in Murray*, 745 F.3d at 1000).

We apply our review under § 2254(d) to the last reasoned state court decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). Here, we review the Idaho Supreme Court's 2008 decision. *See Pizzuto I*, 202 P.3d 642. Because that court denied Pizzuto's *Atkins* claim on the merits, our review under § 2254(d) is limited to the record that was before the state court. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). We may grant habeas relief only if we conclude both

that § 2254(d) is satisfied and, on de novo review, that the petitioner is in custody in violation of the Constitution of the United States. *See Frantz v. Hazey*, 533 F.3d 724, 735–37 (9th Cir. 2008) (en banc).[9]

## DISCUSSION

Pizzuto invokes both prongs of § 2254(d). He contends that the Idaho Supreme Court's decision was "contrary to" or involved an "unreasonable application" of Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). Alternatively, he contends that the state court's decision was "based on an unreasonable determination of the facts." *See id.* § 2254(d)(2). We consider these contentions in turn.

### A. Section 2254(d)(1)

We begin by addressing Pizzuto's argument that the Idaho Supreme Court's decision was "contrary to" or involved an "unreasonable application" of clearly established Supreme Court precedent under § 2254(d)(1).

After the *Atkins* decision, the Idaho legislature adopted the following definition of intellectual disability:

> (a) "Mentally retarded" means significantly subaverage general intellectual functioning that is accompanied by significant limitations

---

[9] We may address these two questions – the § 2254(d) inquiry and de novo review of the constitutional claim under §§ 2241(c)(3) and 2254(a) – in any order. *See Frantz*, 533 F.3d at 736. Typically, we conduct the AEDPA inquiry first, and where, as here, § 2254(d) is not satisfied, we need not review the constitutional claim de novo.

in adaptive functioning in at least two (2) of the following skill areas: communication, self-care, home living, social or interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety. The onset of significant subaverage general intelligence functioning and significant limitations in adaptive functioning must occur before age eighteen (18) years.

(b) "Significantly subaverage general intellectual functioning" means an intelligence quotient of seventy (70) or below.

Idaho Code § 19-2515A(1).

In 2008, the Idaho Supreme Court applied this definition for the first time in Pizzuto's case. *See Pizzuto I*, 202 P.3d at 650–55. The court began by noting that "the statutory definition . . . requires proof of three elements: (1) an intelligence quotient (IQ) of 70 or below; (2) significant limitations in adaptive functioning in at least two of the ten areas listed; and (3) the onset of the offender's IQ of 70 or below and the onset of his or her significant limitations in adaptive functioning both must have occurred before the offender turned age eighteen." *Id.* at 651. Focusing on the first element, the court held that, "[i]n order for Pizzuto to have presented a *prima facie* case, there must be evidence showing that he had an IQ of seventy or below before age eighteen." *Id.*

The court then noted that the record included only one IQ test score for Pizzuto – a Verbal IQ of 72 on the Wechsler

Adult Intelligence Scale, Revised, administered by Dr. Emery in December 1985, shortly before Pizzuto's 29th birthday. *See id.* This test score, the court concluded, was insufficient to establish an IQ of 70 or below before the age of 18:

> Pizzuto argues that an IQ score is only accurate within five points. He contends that his actual IQ could have been five points lower or higher than 72. There are two problems with that argument.
>
> First, when enacting Idaho Code § 19-2515A(1), the legislature did not require that the IQ score be within five points of 70 or below. It required that it be 70 or below. Although Pizzuto argued that the district court should infer that Pizzuto's actual IQ was lower than his test score, the court could just as reasonably have inferred that it was higher. The alleged error in IQ testing is plus or minus five points. The district court was entitled to draw reasonable inferences from the undisputed facts. It would be just as reasonable to infer that Pizzuto's IQ on December 12, 1985, was 77 as it would be to infer that it was 67.
>
> Second, Pizzuto's argument also requires the district court to infer that Pizzuto's IQ had not decreased during the eleven-year period from his eighteenth birthday to the date of his IQ test. The district court, as the trier of fact, was not required to make that inference, especially in light of the opinions of Pizzuto's

> experts that his long history of drug abuse and
> his epilepsy would have negatively impacted
> his mental functioning.

*Id.* (citation omitted).

Pizzuto argues that the Idaho Supreme Court's decision was both "contrary to" and an "unreasonable application" of *Atkins*. His argument begins with the premise that *Atkins* "embraced the clinical definitions of intellectual disability set by the American Association on Mental Retardation . . . and the American Psychiatric Association." Opening Brief at 26 (citing *Atkins*, 536 U.S. at 308 n.3, 317 n.22). Then, relying on that premise, he argues that the Idaho court disregarded these clinical definitions by (1) applying a "hard IQ-70 cutoff" and (2) requiring him to provide the court with IQ testing completed before his 18th birthday. *Id.* at 31–36.

Specifically, Pizzuto contends that the Idaho Supreme Court's application of a "hard IQ-70 cutoff" disregarded the clinical definitions by: (1) "expressly confin[ing] the consideration of the first criteri[on] to an IQ score only," "tak[ing] the IQ score as final and conclusive evidence of a defendant's intellectual capacity when experts in the field would consider other evidence"; (2) "reject[ing] the scientific limitations of testing, including the standard of error measurement . . . universally recognized by the medical and psychological professions"; (3) "completely misunderst[anding] the purpose and effect of the [standard error of measurement]"; and (4) "refus[ing] to consider the . . . Flynn Effect." *Id.* at 31–32.

### 1. "Contrary to" Prong

Initially, we reject Pizzuto's argument that the Idaho court's decision was "contrary to" *Atkins*. For purposes of § 2254(d)(1), "clearly established Federal law" includes only the holdings, as opposed to the dicta, of the Supreme Court's decisions. *See White v. Woodall*, 572 U.S. 415, 419 (2014). Here, the Idaho Supreme Court identified the applicable Supreme Court precedent – *Atkins* – and acknowledged its holding that the Eighth Amendment prohibits the execution of intellectually disabled offenders. *See Pizzuto I*, 202 P.3d at 648. The state court's decision, therefore, was not "contrary to" *Atkins*. Although Pizzuto argues that the state court failed to follow the clinical standards issued by the AAMR and the American Psychiatric Association, *Atkins* did not *hold* that these standards apply. *See Shoop*, 139 S. Ct. at 507 ("*Atkins* gave no comprehensive definition of 'mental retardation' for Eighth Amendment purposes."). The state court's decision, therefore, could not have been "contrary to" *Atkins* on this basis.

We also reject Pizzuto's suggestion that the Idaho Supreme Court's application of a hard IQ-70 cutoff was "contrary to" or an "unreasonable application of" *Atkins*' "progeny" – a reference to *Hall*, *Brumfield* and *Moore I*. Opening Brief at 31. These three cases were decided in 2014, 2015 and 2017 respectively – years *after* the Idaho Supreme Court's 2008 decision in Pizzuto's case. "[U]nder . . . § 2254(d)(1), habeas relief may be granted only if the state court's adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of,' Supreme Court precedent that was 'clearly established' *at the time of the adjudication*." *Shoop*, 139 S. Ct. at 506 (emphasis added); *see also Lockyer v. Andrade*, 538 U.S. 63, 71–72

(2003) ("'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court *at the time the state court renders its decision*." (emphasis added)).  The Idaho Supreme Court's decision, therefore, could not have been "contrary to" or an "unreasonable application" of *Atkins*' "progeny."

## 2.  "Unreasonable Application" Prong

Pizzuto's contention that the Idaho Supreme Court's decision involved an "unreasonable application" of *Atkins* fails as well.

Pizzuto is correct that the Idaho Supreme Court's application of a "hard IQ-70 cutoff" was inconsistent with the clinical definitions in place at the time of the state court's decision.  The DSM-IV, adopted in 2000, defined the diagnostic criteria for intellectual disability as:

> A. Significantly subaverage intellectual functioning: an IQ of *approximately 70 or below* on an individually administered IQ test (for infants, a clinical judgment of significantly subaverage intellectual functioning).

> B. Concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-

> direction, functional academic skills,
> work, leisure, health, and safety.

C.  The onset is before age 18 years.

DSM-IV at 49 (emphasis added).  This standard does not
require an IQ of 70 or below; it requires "an IQ of
*approximately* 70 or below."  *Id.* (emphasis added).  Under
the DSM-IV, therefore, "it is possible to diagnose Mental
Retardation in individuals with IQs between 70 and 75 who
exhibit significant deficits in adaptive behavior."  *Id.*
at 41–42.[10]

The 10th edition of the AAMR manual, adopted in 2002,
defined intellectual disability as follows:

---

[10] Under the DSM-IV:

> Significantly subaverage intellectual functioning is
> defined as an IQ of about 70 or below (approximately
> 2 standard deviations below the mean).  It should be
> noted that there is a measurement error of
> approximately 5 points in assessing IQ, although this
> may vary from instrument to instrument (e.g., a
> Wechsler IQ of 70 is considered to represent a range of
> 65–75).  Thus, it is possible to diagnose Mental
> Retardation in individuals with IQs between 70 and 75
> who exhibit significant deficits in adaptive behavior.
> Conversely, Mental Retardation would not be
> diagnosed in an individual with an IQ lower than 70 if
> there are no significant deficits or impairments in
> adaptive functioning.

DSM-IV at 41–42.

> Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

AAMR, Mental Retardation: Definition, Classification, and Systems of Supports 8 (10th ed. 2002). Under the intellectual functioning prong, "[t]he criterion for diagnosis is *approximately* two standard deviations below the mean, considering the standard error of measurement for the specific assessment instrument used and the instrument's strengths and weaknesses." *Id.* at 37 (emphasis added). "In effect, this expands the operational definition of mental retardation to 75, and that score of 75 may still contain measurement error." *Id.* at 59.

In contrast to these clinical standards, the Idaho Supreme Court required an offender to establish an IQ of 70 or below under all circumstances, regardless of the offender's deficits in adaptive functioning. Although the Idaho court recognized that "[t]he alleged error in IQ testing is plus or minus five points," *Pizzuto I*, 202 P.3d at 651, it nonetheless required Pizzuto to establish an "actual IQ" of 70 or below. *See Pizzuto III*, 729 F.3d at 1217 n.2; *Pizzuto I*, 202 P.3d at 651 ("[T]he statutory definition . . . requires proof of . . . an intelligence quotient (IQ) of 70 or below . . . . Significant limitations in adaptive functioning alone will not bring an offender within the protection of the statute."); *id.* ("[W]hen enacting Idaho Code § 19-2515A(1), the legislature did not require that the IQ score be within five points of 70 or below. It required that it be 70 or below."). In doing so, the court failed to recognize that "it is possible to diagnose Mental

Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior." DSM-IV at 41–42. Nor did the court consider whether Pizzuto satisfied this standard. The state court's decision, therefore, was contrary to the clinical definitions in place at the time.

This conclusion alone, however, does not establish that the Idaho Supreme Court unreasonably applied *Atkins* for purposes of § 2254(d)(1). At the time of the state court's decision in 2008, it was not yet apparent that states were required to define intellectual disability in accordance with these prevailing clinical definitions. To be sure, *Atkins* had cited these clinical definitions with approval, noting that statutory definitions generally conformed to them and explaining that "an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Atkins*, 536 U.S. at 308 n.3, 309 n.5, 317 n.22. The Court, however, did not adopt these definitions or require states to follow them. On the contrary, the Court expressly "le[ft] to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Id.* at 317 (alterations omitted) (quoting *Ford*, 477 U.S. at 416–17).

It is *now* clear that "[t]he legal determination of intellectual disability . . . is informed by the medical community's diagnostic framework," *Hall*, 572 U.S. at 721, and that "[t]he medical community's current standards supply one constraint on States' leeway in this area," *Moore I*, 137 S. Ct. at 1053. It was not apparent in 2008, however, that states were required to adhere strictly to the AAMR's and American Psychiatric Association's clinical standards. We acknowledge *Hall*'s statements that *Atkins* "provide[d]

substantial guidance on the definition of intellectual disability," that "[t]he clinical definitions of intellectual disability . . . were a fundamental premise of *Atkins*" and that "*Atkins* did not give the States unfettered discretion to define the full scope of the constitutional protection." *Hall*, 572 U.S. at 719–21. The Supreme Court, however, has held that "*Atkins* gave no comprehensive definition of 'mental retardation' for Eighth Amendment purposes." *Shoop*, 139 S. Ct. at 507; *see also Bobby v. Bies*, 556 U.S. 825, 831 (2009) (explaining that *Atkins* "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation 'will be so impaired as to fall within *Atkins*' compass'" (alteration omitted) (quoting *Atkins*, 536 U.S. at 317)); *Ybarra v. Filson*, 869 F.3d 1016, 1024 (9th Cir. 2017) ("Significantly, *Atkins* 'did not provide definitive procedural or substantive guides' to determine who qualifies as intellectually disabled." (quoting *Bies*, 556 U.S. at 831)); *Moormann v. Schriro*, 672 F.3d 644, 648 (9th Cir. 2012) ("The Supreme Court in *Atkins* did not define mental retardation as a matter of federal law.").

This is not a case in which the state court utterly disregarded the clinical definitions. To be sure, the Idaho Supreme Court erred by defining the significantly subaverage intellectual functioning criterion as an IQ of 70 or below, *see* Idaho Code § 19-2515A(1)(b); *Pizzuto I*, 202 P.3d at 651, rather than "an IQ of *approximately* 70 or below," DSM-IV at 49 (emphasis added), and it erred by disregarding the portions of the clinical standards recognizing that "it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior," *id.* at 41–42. In other respects, however, § 19-2515A(1) tracks the clinical definitions cited by *Atkins*. *See Atkins*, 536 U.S. at 308 n.3. In contrast to *Hall*,

moreover, the Idaho court at least recognized the existence of a standard error of measurement of plus or minus five points and afforded Pizzuto an opportunity to "present additional evidence of intellectual disability even when an IQ test score is above 70." *Hall*, 572 U.S. at 717.

In short, because it was not apparent in 2008 that states were required to adhere closely to the clinical definitions of intellectual disability, the Idaho Supreme Court's application of a "hard IQ-70 cutoff" was not an "unreasonable application" of *Atkins*. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *Woodall*, 572 U.S. at 427 (quoting *Richter*, 562 U.S. at 103). We cannot say that this standard has been satisfied here.

Relatedly, it is *now* clear as a matter of federal law that "an individual with an IQ test score 'between 70 and 75 or lower' may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." *Hall*, 572 U.S. at 722 (citation omitted) (quoting *Atkins*, 536 U.S. at 309 n.5); *see id.* at 723 ("[W]hen a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits."); *Brumfield*, 135 S. Ct. at 2278 ("[I]t is unconstitutional to foreclose 'all further exploration of intellectual disability' simply because a capital defendant is deemed to have an IQ above 70." (quoting *Hall*, 572 U.S. at 704)); *Moore I*, 137 S. Ct. at 1049 ("Because the lower end of Moore's score range falls at or below 70, the [state court] had to move on to

consider Moore's adaptive functioning."); DSM-5 at 37 ("Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points).  On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65–75 (70 ± 5)."); *id.* ("IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks.  For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score."); AAIDD-11 at 35 ("[T]he intellectual functioning criterion for diagnosis of [intellectual disability] is approximately two standard deviations below the mean, considering the standard error of measurement . . . .  The intent of this definition is not to specify a hard and fast cutoff point/score for meeting the significant limitations in intellectual functioning criterion . . . .  In addition, significant limitations in intellectual functioning is only one of the three criteria used to establish a diagnosis of [intellectual disability]."); *id.* at 40 ("A fixed point cutoff score for [intellectual disability] is not psychometrically justifiable.").  The Idaho Supreme Court violated this principle by requiring an "actual" IQ of 70 or below.  This point, however, was not beyond fairminded disagreement in 2008.  We cannot say, therefore, that the Idaho Supreme Court's application of *Atkins* "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*, 562 U.S. at 103.

We reach the same conclusion with respect to the Idaho Supreme Court's failure to apply the Flynn effect.[11]  Although mentioned in recent clinical standards, *see* DSM-5 at 37; AAIDD-11 at 37, *Atkins* did not discuss the Flynn effect, and clinical standards in existence at the time of the Idaho Supreme Court's decision in 2008 did not discuss the need to adjust IQ test scores to account for the use of outdated test norms.  Thus, "it cannot be said that the [state court's] failure to consider and apply the Flynn Effect is contrary to, or an unreasonable application of, clearly established federal law." *Hooks v. Workman*, 689 F.3d 1148, 1170 (10th Cir. 2012).

Finally, we reject Pizzuto's contention that the Idaho Supreme Court's decision was contrary to or an unreasonable application of *Atkins* because the court required him to provide the results of an IQ test *administered* before his 18th birthday.  With respect to this contention, we simply disagree

---

[11] The Flynn effect refers to the observation that IQ scores have been increasing over time. *See* AAIDD-11 at 37; *Smith v. Ryan*, 813 F.3d 1175, 1184 (9th Cir. 2016) ("The basic premise of the Flynn effect is that because average IQ scores increase over time, a person who takes an IQ test that has not recently been normed against a representative sample of the population will receive an artificially inflated IQ score." (emphasis omitted)).  In light of this effect, the AAIDD has indicated that "best practices require recognition of a potential Flynn Effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score." AAIDD-11 at 37.  "In cases where a test with aging norms is used, a correction for the age of the norms is warranted." *Id.*; *see Smith*, 813 F.3d at 1185 (noting that the AAIDD-11 "recognizes the existence of the Flynn Effect and recommends correcting for the age of norms in outdated tests").  The DSM-5 likewise identifies the Flynn effect as one of several "[f]actors that may affect test scores." DSM-5 at 37.  Here, Pizzuto argues that, when his IQ score of 72 is adjusted for the Flynn effect, "it becomes a score of 70." Opening Brief at 33 n.2.

with Pizzuto's reading of the Idaho Supreme Court's decision. If the state court had required Pizzuto to present a pre-18 IQ test score, it could have disposed of his claim simply by noting the absence of such a score in the record. Instead, it explained that "there must be evidence showing that [Pizzuto's] IQ was 70 or below prior to his eighteenth birthday," *Pizzuto I*, 202 P.3d at 651, regardless of when he was tested.

\* \* \*

In sum, the record does not establish that the Idaho Supreme Court's decision was "contrary to" or involved an "unreasonable application" of clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). Although the state court's decision was contrary to clinical standards in place at the time, it was not obvious at that time that strict adherence to the clinical standards was required. Similarly, although the state court's requirement of an IQ of 70 or below is contrary to *Hall*, *Brumfield* and *Moore I*, these decisions all postdated the state court's decision, and it was not obvious under *Atkins* alone that, for Eighth Amendment purposes, "an individual with an IQ test score 'between 70 and 75 or lower' may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." *Hall*, 372 U.S. at 722 (citation omitted) (quoting *Atkins*, 536 U.S. at 309 n.5). *Cf. Shoop*, 139 S. Ct. at 508 ("Although the Court of Appeals asserted that the holding in *Moore* was 'merely an application of what was clearly established by *Atkins*,' the court did not explain how the rule it applied can be teased out of the *Atkins* Court's brief comments about the meaning of what it termed 'mental retardation.'" (citation omitted)); *Ybarra*, 869 F.3d at 1024–25 ("[A]lthough Ybarra insists that the Nevada Supreme Court unreasonably applied

*Atkins*, he relies almost exclusively on the Supreme Court's subsequent, more detailed decisions in *Moore*, *Hall*, and *Brumfield*. These decisions might redefine and expand *Atkins*, but they cannot show that the Nevada Supreme Court applied *Atkins* in a way that 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" (footnote omitted) (quoting *Richter*, 562 U.S. at 103).

## B.  Section 2254(d)(2)

Pizzuto alternatively contends that the Idaho Supreme Court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Under § 2254(d)(2), we may not characterize a state court's factual determinations as unreasonable "merely because [we] would have reached a different conclusion in the first instance." *Brumfield*, 135 S. Ct. at 2277 (alteration in original) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). "Instead, § 2254(d)(2) requires that we accord the state trial court substantial deference." *Id.* "If '[r]easonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.* (alterations in original) (quoting *Wood*, 558 U.S. at 301).

Here, Pizzuto challenges the state court's factual determinations on several grounds. We address them in turn.

### 1. Pizzuto's Argument That the State Court's Determinations Are Unreasonable Because They Are Inconsistent with Clinical Definitions

Pizzuto argues that the Idaho Supreme Court's factual determinations "are unreasonable because they are not consistent with clinical definitions and best practices in defining and diagnosing [intellectual disability] as guaranteed by the Eighth Amendment in *Atkins* and enforced in *Hall*." Opening Brief at 37. He maintains that "[t]he state court's factual findings are unreasonable in light of the record before it because they are in direct conflict with professional standards established to determine intellectual disability and thus, not 'informed by' them as instructed by *Hall*." *Id.* at 38.

As noted, we agree with Pizzuto that the Idaho Supreme Court failed to apply the clinical standards in use at the time of its decision. Those standards required an IQ of "approximately 70" and recognized that "it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior." DSM-IV at 41–42. The Idaho Supreme Court, by contrast, required an "actual" IQ of "70 or below," irrespective of "[s]ignificant limitations in adaptive functioning." *Pizzuto I*, 202 P.3d at 651. Pizzuto, therefore, is correct in arguing that the state court's determination that he failed to make a prima facie showing of intellectual disability is "not consistent with clinical definitions" discussed in *Atkins* and subsequently required by *Hall*.

Under § 2254(d)(2), however, we review a state court's factual determinations, not its legal conclusions. Here, the Idaho Supreme Court did not purport to determine whether Pizzuto was intellectually disabled under the clinical

definitions. Instead, it determined only that Pizzuto failed to make a prima facie "showing that his IQ was 70 or below prior to his eighteenth birthday." *Id.* It is that factual determination, therefore, that we may review under § 2254(d)(2), not the state court's legal conclusion that an IQ of 70 or below was required. Accordingly, we must reject Pizzuto's contention that the state court's factual determinations are unreasonable merely because the state court did not apply the clinical definitions of intellectual disability.

### 2. Pizzuto's Argument That the State Court's Unreasonably Failed to Consider His School Records as Evidence of Subaverage Intellectual Functioning

Pizzuto argues that the Idaho Supreme Court's determination that he failed to make a prima facie showing that his IQ was 70 or below before his 18th birthday was unreasonable because it focused exclusively on his single IQ test score while ignoring other evidence of subaverage intellectual functioning in the form of his "abysmal school record." Opening Brief at 39.

Pizzuto is correct that a "state-court fact-finding process is undermined where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." *Taylor*, 366 F.3d at 1001. Here, however, Pizzuto has not shown that the Idaho Supreme Court ignored such evidence.

First, although Pizzuto cites his "abysmal school record," the actual evidence in the record regarding his schooling is sparse and incomplete. It consists solely of affidavits from five educators, two of whom have no specific recollection of

Pizzuto.  Although some of these records show that Pizzuto received low grades and was held back, there are many reasons Pizzuto may have performed poorly in school, and no expert opined that this poor performance was evidence of significantly subaverage intellectual functioning or an IQ of 70 or below.  Thus, even if Pizzuto's school records are some evidence of pre-18 significantly subaverage intellectual functioning, they do not render unreasonable the Idaho Supreme Court's determination that Pizzuto failed to make a prima facie showing that he had an IQ of 70 or below before the age of 18.  School records can be strong evidence of intellectual disability.  *See, e.g.*, *Moore I*, 137 S. Ct. at 1051; *Hall*, 572 U.S. at 705, 712; *Smith*, 813 F.3d at 1186.  Here, however, the records do not show that the state court's determination was objectively unreasonable under § 2254(d)(2)'s demanding standard.

Second, we cannot say that the Idaho Supreme Court *ignored* this evidence within the meaning of *Taylor* when it was Pizzuto himself who failed to bring the evidence to the court's attention.  In state court, Pizzuto cited his school records to show limitations in adaptive functioning but not to establish subaverage intellectual functioning.  To establish the latter, Pizzuto instead "relied solely upon Dr. Emery's IQ determination."  *Pizzuto I*, 202 P.3d at 652.  The state court's focus on Pizzuto's IQ test score, therefore, was consistent with Pizzuto's own contentions.

### 3. Pizzuto's Argument That the State Court Unreasonably Determined That His IQ Could Have Declined in Adulthood Due to Drug Abuse and Epilepsy

Pizzuto argues that it was unreasonable for the Idaho Supreme Court to determine that his IQ could have declined between the time he was 18 (in 1974) and the time of Dr. Emery's IQ testing (in 1985).

The Idaho Supreme Court determined that the state trial court could have inferred that Pizzuto's IQ "decreased during the eleven-year period from his eighteenth birthday to the date of his IQ test . . . , especially in light of the opinions of Pizzuto's experts that his long history of drug abuse and his epilepsy would have negatively impacted his mental functioning." *Pizzuto I*, 202 P.3d at 651.

Pizzuto contends that this determination was unreasonable. First, he argues that "incidents of drug use and epilepsy, if they occurred, would be documented," because he spent nine of these 11 years in prison. Opening Brief at 40. Because his prison records do not show continued seizures or drug use, Pizzuto argues that a "more reasonable inference" would be that he was substantially drug free and not experiencing seizures after he turned 19. *Id.* at 41–42.

The Idaho Supreme Court's determination, however, was based on record evidence from Pizzuto's own experts. In 1988, Dr. James Merikangas noted that Pizzuto had "a life long history of almost continuous drug abuse including intravenous Heroin as well as cocaine, speed and marijuana"; that Pizzuto's "long history of polydrug abuse has caused him further neurological dysfunction and . . . substantial defects

of mind and reason"; and that "[w]e will probably not know to any scientific degree of accuracy what his state of mind was at the time of the alleged crimes." In 2004, Dr. Craig Beaver opined that Pizzuto would benefit from further neurological study in part because, "[o]ften, patients that have persistent seizure disorders . . . will decline over time in their overall mental abilities":

> Mr. Pizzuto has continued to require pharmacological management of his seizure disorder since he was last examined by myself in 1996. He has continued to have neurological difficulties. Therefore, given that it has now been over eight years since his last comprehensive neuropsychological examination, I would strongly recommend that he undergo repeat neuropsychometric studies. Repeat neuropsychometric studies are needed to better determine Gerald Pizzuto's cognitive abilities. Often, patients that have persistent seizure disorders, for example, will decline over time in their overall mental abilities.

In light of this evidence, it was not unreasonable for the Idaho Supreme Court to determine that the state trial court reasonably could have inferred that Pizzuto's IQ may have declined as a result of drug abuse or epilepsy. Even if, as Pizzuto contends, a "more reasonable inference" would be that he was substantially drug free and not experiencing seizures after he turned 19, this does not render the state court's contrary determination objectively unreasonable under § 2254(d)(2).

Second, Pizzuto argues that it would have been unreasonable to infer from Dr. Beaver's 2004 affidavit that Pizzuto's mental functioning may have declined between 1974 and 1985, *see Pizzuto I*, 202 P.3d at 652, because "[t]here is no statement in the affidavit that Mr. Pizzuto's IQ had declined . . . between 1996 and 2008," let alone "any statement that Mr. Pizzuto's IQ had declined . . . from his 18th birthday to the time of Dr. Emery's testing." Opening Brief at 42. Dr. Beaver's affidavit, however, clearly gave the impression that Pizzuto's mental functioning may have declined between 1996 and 2004. It would not have been unreasonable, therefore, to infer that it also might have declined between 1974 and 1985. Dr. Beaver did not need to expressly state that a decline in IQ occurred for the Idaho Supreme Court to determine that it was possible. The very reason Dr. Beaver requested more testing was that those with persistent seizure disorders, like Pizzuto, tend to decline in their mental abilities over time. The Idaho Supreme Court's determination, therefore, was not unreasonable.

### 4. Pizzuto's Argument That the State Court's Denial of an Evidentiary Hearing Was Based on an Unreasonable Determination of the Facts

Pizzuto argues that he "only needed to raise a reasonable doubt regarding his intellectual capacity to be entitled to an evidentiary hearing" and that the Idaho Supreme Court's determination that he "did not meet that low threshold was unreasonable" under § 2254(d)(2). Opening Brief at 46.

This argument is unpersuasive. First, although Pizzuto argues that the Idaho Supreme Court unreasonably determined that he did not raise a reasonable doubt regarding his intellectual capacity, the Idaho Supreme Court in fact

never addressed that question. The only question the state court decided was whether Pizzuto had made a *prima facie showing* of intellectual disability, in particular whether he had made a prima facie showing of a pre-18 IQ of 70 or below. The court did not address whether Pizzuto had raised a "reasonable doubt" as to his intellectual disability. Accordingly, there is no "reasonable doubt" determination for us to review under § 2254(d)(2).

Second, although Pizzuto contends that the Idaho Supreme Court's failure to apply a "reasonable doubt" standard was "contrary to, and an unreasonable application of *Atkins*," as "expressly addressed in *Brumfield*," we must disagree. Opening Brief at 46. *Atkins* did not address the legal standard applicable to a request for an evidentiary hearing. In *Brumfield*, the *state courts* adopted a reasonable doubt standard, *see Brumfield*, 135 S. Ct. at 2274, and the Supreme Court *presumed* that this standard would be consistent with *Atkins*, *see id.* at 2276 ("[W]e do not question the propriety of the legal standard the trial court applied, and presume that a rule according an evidentiary hearing only to those capital defendants who raise a 'reasonable doubt' as to their intellectual disability is consistent with our decision in *Atkins*."). The Court, however, did not *adopt* a reasonable doubt standard. *See id.* The Idaho Supreme Court's failure to apply such a standard, therefore, was not "contrary to" or an "unreasonable application" of *Atkins*. *See* 28 U.S.C. § 2254(d)(1).

### 5. Pizzuto's Argument That the State Court's Factfinding Process Was Unreasonable

Pizzuto argues more broadly that the denial of a hearing, as well as the denial of access to an expert, rendered the

Idaho Supreme Court's factfinding process itself unreasonable under § 2254(d)(2).

As we explained in *Hibbler*, 693 F.3d at 1146, "[c]hallenges under § 2254(d)(2) fall into two main categories." "First, a petitioner may challenge the substance of the state court's findings and attempt to show that those findings were not supported by substantial evidence in the state court record." *Id.* Second, as relevant here, "a petitioner may challenge the fact-finding process itself on the ground that it was deficient in some material way." *Id.* In some circumstances, for instance, a "state court's failure to hold an evidentiary hearing may render its fact-finding process unreasonable under § 2254(d)(2)." *Id.* at 1147.

The Idaho Supreme Court did not specifically address whether the state trial court erred by granting summary judgment to the state on Pizzuto's *Atkins* claim without holding an evidentiary hearing. The court, however, addressed a related question – whether the state trial court erred by dismissing Pizzuto's petition without permitting further testing. *See Pizzuto I*, 202 P.3d at 655–56. The court concluded that the trial court did not err. First, the court noted that Pizzuto had not pursued the motion for testing. Pizzuto had moved for additional testing in October 2004 but he "did not notice this motion for a hearing." *Id.* at 655. Instead, "[w]ithout pursuing the motion for testing, Pizzuto moved for summary judgment on September 23, 2005." *Id.* He did so, moreover, even though, under Idaho law, "[i]f a trial court denies a party's motion for summary judgment, it has discretion to grant summary judgment to the opposing party." *Id.* at 656 (citing *Hardwood v. Talbert*, 39 P.3d 612, 617 (Idaho 2001)). Even in connection with the summary judgment proceedings, "Pizzuto did not ask the [state trial]

court to rule on his motion for the specified additional testing." *Id.*

Second, as framed by the Idaho Supreme Court, the central issue in the case was whether Pizzuto could establish a pre-18 IQ of 70 or below. Pizzuto did not argue that, were he afforded the opportunity to conduct further testing, he would develop additional evidence on that question. The court reasoned:

> The definition of "mentally retarded" in Idaho Code § 19-2515A requires that the defendant have an IQ of 70 or below both at the time of the murder(s) and prior to age eighteen. In its briefing opposing Pizzuto's motion for summary judgment, the State argued that Pizzuto had failed to provide evidence that his IQ was 70 or below and failed to provide evidence showing it was 70 or below prior to his eighteenth birthday. Pizzuto's alleged IQ is obviously a matter requiring expert testimony. He did not offer any expert testimony opining that his IQ was ever 70 or below, *nor does he allege that the requested additional testing was intended to address that issue*.

*Id.* (emphasis added).

In short, Pizzuto did not pursue his motion for additional testing, and he did not contend that further factual development of the record would shed additional light on the dispositive issue – his ability to establish a pre-18 IQ of 70 or below. Under these circumstances, we cannot say that the

denial of an evidentiary hearing rendered the state court's factfinding process unreasonable under § 2254(d)(2)'s highly deferential standard. *See Hibbler*, 693 F.3d at 1146–47 ("[W]hen the challenge is to the state court's procedure, mere doubt as to the adequacy of the state court's findings of fact is insufficient; we must be satisfied that *any* appellate court to whom the defect in the state court's fact-finding process is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." (alterations and internal quotation marks omitted)).

### 6. Pizzuto's Remaining § 2254(d)(2) Arguments

The § 2254(d)(2) portion of Pizzuto's opening brief appears to fault the Idaho Supreme Court's decision on several other grounds. The brief says, for example, that the Idaho Supreme Court's decision "rests on an irregular application of Idaho law." Opening Brief at 37. It also asserts that the state court's denial of an evidentiary hearing violated Idaho Code § 19-2515A, as well as the "requirements of Due Process and Equal Protection." *Id.* at 44. Pizzuto's brief, however, does not "specifically and distinctly" argue these issues. *See United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005). We therefore decline to address them. *See id.*

* * *

In sum, the record does not establish that the Idaho Supreme Court's decision was based on an unreasonable determination of the facts under § 2254(d)(2).

## CONCLUSION

Because § 2254(d) is not satisfied, we hold that the district court properly denied habeas relief. We need not address Pizzuto's remaining appellate arguments or review his *Atkins* claim de novo. Accordingly, we do not address whether Pizzuto is intellectually disabled or whether his execution would violate the Eighth Amendment.

Our decision, however, does not preclude the Idaho courts from reconsidering those questions in light of intervening events. Although the Idaho courts rejected Pizzuto's *Atkins* claim in 2008, they did so without the benefit of an evidentiary hearing, without the benefit of the Supreme Court's decisions in *Hall*, *Brumfield* and *Moore I*, and without the benefit of the most recent iterations of the AAIDD and American Psychiatric Association clinical standards. Since 2008, the United States Supreme Court has made clear that "it is unconstitutional to foreclose 'all further exploration of intellectual disability' simply because a capital defendant is deemed to have an IQ above 70," *Brumfield*, 135 S. Ct. at 2278 (quoting *Hall*, 572 U.S. at 704), and the professional clinical standards now advise that "best practices require recognition of a potential Flynn Effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score," AAIDD-11 at 37. The Idaho courts have not yet addressed whether, under these standards, Pizzuto's execution would violate the Eighth Amendment.

The judgment of the district court is affirmed. Each party shall bear its own costs on appeal.

**AFFIRMED.**